Roy Charlette *vs.* Charlette Brothers Foundry, Inc.,
& another.[1]

No. 01-P-695.

Worcester. April 15, 2003. - August 22, 2003.

Present: Beck, Smith, & Duffly, JJ.

*Practice, Civil,* Findings by judge. *Negotiable Instruments,* Note. *Fiduciary. Corporation,* Close corporation. *Judgment,* Preclusive effect. *Receiver.*

In an action by an officer of a corporation against the corporation and another officer, seeking to collect on a promissory note issued by the corporation reflecting unpaid bonuses, the judge's conclusion that the note was in accordance with an understanding and agreements of the shareholders and officers and was valid was supported by the evidence and was not clearly erroneous. [42]

In counterclaims for breach of fiduciary duty in response to a corporate officer's action to collect on a promissory note issued by the corporation reflecting the officer's unpaid bonuses that he himself had authorized, the judge properly concluded that, although the officer should not have bypassed corporate approvals of his bonuses, the actual amounts of the bonuses were well within the range of reasonable compensation to which he was entitled. [42-43]

A corporate officer's (plaintiff's) claim against the corporation and another officer seeking to collect on a promissory note issued by the corporation reflecting unpaid bonuses was not barred by claim preclusion (i.e., on the ground that the claim should have been included in the plaintiff's prior petition for receivership as a separate count to recover on the note) where, when the plaintiff sought the remedy of receivership, he sought to protect the corporate assets of the corporation for any and all creditors, but, by filing the present action, he sought to establish the corporation's liability on a debt to him, liability that, in the circumstances, would not and could not have been pursued in the petition for receivership. [44-46]

Civil action commenced in the Superior Court Department on July 24, 1996.

The case was heard by *Martha B. Sosman,* J.

*Richard C. Van Nostrand* for Charlette Brothers Foundry, Inc.

[1]Ronald Charlette.

*Helene Gerstle* for the plaintiff.

Smith, J. The plaintiff, Roy Charlette (Roy), brought an action in Superior Court against the defendants, Charlette Brothers Foundry, Inc. (Foundry), and Ronald Charlette (Ronald) seeking to collect on a promissory note issued to him by the Foundry. Roy also included in his action claims against the Foundry and Ronald for wrongful termination, intentional interference with his employment contract, and violations of G. L. c. 93A.[2] The defendants answered the complaint, denying all of the allegations and asserting two counterclaims for breach of fiduciary duty: one claiming self-dealing by Roy in connection with his compensation, and the second for alleged actions by Roy that were undertaken to interfere and obstruct the Foundry's operations. The defendants' motion to dismiss Roy's claims was denied, as was their motion for summary judgment.

After a trial in Superior Court, a judge, sitting without a jury, made detailed written findings and awarded judgment for Roy against the Foundry on the promissory note cause of action, ordering the Foundry to pay Roy $47,618, plus interest. The judge rejected Roy's other claims against the Foundry and Ronald.

With respect to the defendants' counterclaims, the judge found in favor of Roy on the cause of action alleging self-dealing but found for the defendants on their counterclaim alleging Roy improperly interfered with the Foundry's operation. As a result of that finding, the judge issued a permanent injunction ordering Roy not to interfere with the Foundry's operation.

The Foundry appealed from the judge's findings in favor of Roy on his promissory note claim, as well as from the judge's findings in favor of Roy on the defendants' counterclaim of self-dealing. Ronald did not appeal. Roy did not appeal from the denial of his other claims.

*Facts.* We summarize the facts found by the trial judge, supplemented by additional uncontested evidence appearing on the record, reserving certain details for our discussion of the issues.

[2]The G. L. c. 93A claim was waived at trial, and the judge ordered that it be dismissed.

The Foundry is engaged in the business of iron casting and is located in Blackstone. The Foundry was started by Peter and John Charlette in the early 1900's and incorporated in 1947. Ultimately, the ownership of the business passed to John's four sons: Leo, David, Ralph, and the plaintiff, Roy.

After Leo's death in 1976, Roy served as president and treasurer of the Foundry until July of 1991.[3] Roy also served as a director and majority shareholder. David served as vice-president and clerk of the company from 1976 to 1984. Both brothers also worked full-time at the Foundry and were actively engaged in its operations.

The Foundry's by-laws authorized its board of directors to exercise "control and management of the business and property" of the corporation. In particular, the board had the power to "appoint and remove" employees, as well as to fix or change, from time to time, employee salaries or compensation.

By a vote on January 16, 1978, the board established written duties for company officers, including the president, whose obligation it was to "negotiate[] and consummate[] all loans and financial transactions at all levels of the Corporation" and "make[] full reports to the Board of Directors and to the Corporation of all financial transactions at appropriate times."

The defendant Ronald, son of David Charlette, began working at the Foundry in 1977, became a vice-president in 1979, and was elected to the board of directors in 1981. In 1984, David retired and Ronald acquired a portion of his father's stock. In 1986, the corporation also repurchased some of Leo, Jr.'s, stock. By 1991, as a result of these transactions, Roy was left with forty shares of stock, Ronald with twenty shares, David with twenty shares, and Leo, Jr., with ten shares. Two of Roy's sons, Earl and Richard, also worked at the Foundry. Earl acquired ten shares of stock from his father in 1988 or 1989.

Though there was evidence that the board was actively involved in approving significant equipment purchases, issues of employee or officer compensation or bonuses were never raised at either the shareholder or board of directors meetings.

---

[3]After Leo's death in 1976, company stock was held by Roy, David, and Leo's son, Leo, Jr.

From around the time of its incorporation, the Foundry had used the services of an accountant, one Albert Lambert, to keep its books and prepare tax returns. Roy consulted with Lambert in regard to compensation for employees, officers, and directors. On Lambert's advice, Roy drew a weekly paycheck plus deferred compensation that was taken as a lump sum at the end of each month. From 1984 through 1990, Roy's annual total paycheck (weekly pay plus the month-end extra check) was on the order of $42,000 to $46,000.

The Foundry did not have any pensions, retirement, or severance package. On the advice of Lambert, Roy started to pay bonuses to himself and other officers, directors, shareholders, and employees. The bonuses were issued in lieu of any retirement or severance benefits. After calculating the amount that the company could commit to paying as a bonus, the practice was to have a substantial portion of the bonus made payable by way of short-term promissory notes, thus avoiding any sudden drain of cash from the company. Promissory notes representing bonuses were signed by Roy and issued to himself and to others, including Ronald and Roy's sons, Earl and Richard. On occasion, when a bonus promissory note had not been paid in full by the time of the next year's bonus, the amount still outstanding would be included in the next year's note.

In 1986, the total compensation including the bonus received by Roy was $44,820, while Ronald received $24,002. Richard and Earl each received approximately $25,000 in compensation. For 1987, Roy received a total of $83,800, while Ronald received $50,052, Earl received $55,465, and Richard received $33,369. In 1988, Roy received $94,700, Ronald received $63,068, Earl received $68,437, and Richard received $39,661. For 1989, Roy received $168,650, Ronald received $113,189, and Earl received $117,944. In 1990, Roy received $89,000, Ronald received $57,172, and Earl received $61,854.

The 1989 bonuses were, as was customary, paid largely by promissory note. In December of 1989, Roy signed a promissory note from the Foundry to himself in the amount of $60,218, payable in one year, with interest at ten per cent. Payment to Roy over the next year, however, was only $40,000 plus interest, leaving an outstanding balance of $20,218 still owing on

the note. Thus, when the promissory notes for the year 1990 were issued, the new note to Roy included his 1990 bonus, plus the $20,218, for a total amount of $47,618. At no time during the 1980's did Ronald question the compensation his uncle was receiving, nor did he question how his own salary and bonus were calculated. Ronald also did not question the practice of using promissory notes to pay the bonuses.

At some point in 1990, Ronald became aware of the bonus payments to Earl and Richard. Roy resisted efforts by Ronald to discuss the particulars of these payments. Instead, Ronald asked the company's counsel, one Wayne Davies, to undertake an investigation. Davies found that there was no significant issue with the year-end bonus amounts to Roy and his sons, but Davies questioned the propriety of Roy's drawing an additional paycheck, on a monthly basis, during the relevant time period. Davies inquired of Roy by letter, but received no response.

Ronald then called a shareholders meeting for July 11, 1991. Through the fifty shares that he controlled,[4] Ronald succeeded in obtaining the revision of the corporate by-laws and getting himself, Earl, and Leo, Jr., elected as directors. Ronald then nominated Earl as president; himself as vice-president, treasurer and clerk; and Roy as vice-president. Roy voted for this proposed slate of officers, with Earl abstaining. The compensation for the various officers was also set at this meeting, and Ronald also raised the issue of outstanding bonuses, noting that the 1990 bonuses had not been paid. It was voted that Ronald, as treasurer, pay the remaining unpaid balance of the 1990 bonuses to each employee stockholder.

On August 21, 1991, the directors (Earl, Ronald, and Leo, Jr.) held a special meeting. Ronald raised the issue whether the annual bonuses paid to stockholder employees in previous years were valid and authorized. The board (with Earl abstaining) voted to have Davies examine "whether authority existed for Roy to distribute previous year-end bonuses and what action may be appropriately taken by the board."

---

[4]Ronald had his own twenty shares, plus, by proxy, the twenty shares held by his father, David, and the ten shares held by his cousin, Leo, Jr. Roy attended the meeting, holding thirty shares. His son Earl, holding ten shares, also attended the meeting.

Davies gave his opinion in a September 11, 1991, letter reporting that, because of the absence of corporate records, he could not ascertain whether the board had ever set compensation levels for officers. Davies also considered whether there had been any prior agreement or understandings regarding compensation, noting that it could be within Roy's implied authority as president to pay officers and employees in accordance with any compensation agreements. With bonuses distributed in a pro rata ratio that the person's particular stock ownership bore to the total number of shares owned by all officers, Davies noted that Roy's bonuses to himself were somewhat less than they should have been. Roy had held fifty per cent of the stock held by officers during the time period in question, which would have entitled him to a bonus of $81,200 (one-half of the total $162,400 paid to the officers as bonuses). Where Roy only received bonuses of $70,000, he had underpaid himself by $11,200.

The issue of improper compensation was taken up again at the May 14, 1992, board of directors meeting. By then, Davies had examined the payroll records dating back to 1984. Treating Roy's month-end lump sum payments as payments in excess of salary, Davies calculated that Roy had overpaid himself $93,400 during the period from 1984 through 1990. Ronald and Leo, Jr., voted (with Earl abstaining) that the corporation make demand on Roy for the amount of $93,400. The bonuses for Ronald, including the $16,800 promissory note, were paid in full.

Ronald and Leo, Jr. (with Earl abstaining), also voted retroactively to set year-end bonuses for employee stockholders "in the ratio that the [person's] stock bore to the total number of shares of stock owned by employee stockholders." Using that formula, Ronald and Leo, Jr., concluded that Roy had improperly paid bonuses to Richard and Earl. No action, however, was taken to recoup the allegedly excessive bonuses paid to Earl or Richard.

The Foundry did not make any payment on the outstanding $47,618 promissory note to Roy because the board determined that Roy had overpaid himself by way of weekly and monthly paychecks during the period of 1984 through 1990. When the

note became due on December 31, 1992, Roy's attorney made demand, which was refused. The Foundry, in turn, requested that Roy repay to the Foundry those monies deemed to be "overpayments," i.e., $93,400.

In February of 1993, Roy filed a petition in Superior Court to have the Foundry put in receivership. As support for his petition for receivership, Roy claimed that his promissory note had not been paid, and he challenged the legality of Ronald's voting of Leo, Jr.'s, shares by proxy at the July 11, 1991, shareholders meeting.

While that action was pending, Roy, who lived in very close proximity to the company's plant, began to place barricades and other obstacles in a private way running between his property and the plant, which hampered the daily operations and deliveries of the Foundry, and caused concern among neighbors and town officials. At trial, Roy candidly admitted that his only reason for suddenly blocking the turnaround space was "spite."

A shareholders meeting was held on February 10, 1994, which Roy did not attend. Ronald and Earl (the only shareholders in attendance) voted to keep Earl as president with Ronald as vice-president, treasurer, and clerk. They also set officers' compensation and benefits. Ronald and Earl voted a new slate of directors consisting of themselves and Ronald's wife, Madeleine.

The shareholders also voted on the distribution of employee bonuses, with the distribution based entirely on stock ownership. The shareholders voted to withhold payment from Roy pending settlement or conclusion of litigation.

On June 19, 1995, a Superior Court judge allowed the Foundry's motion for summary judgment, dismissing Roy's petition for the appointment of a receiver and his claim of an improper proxy vote.

In December of 1995, a special stockholders meeting was held at which Roy's employment was terminated. Ronald was the only shareholder present when a vote was taken to terminate Roy. Other matters discussed once Earl and Madeleine arrived

were the election of officers,[5] directors,[6] salary, benefits, and bonuses.

In March of 1996, by an order pursuant to Appeals Court Rule 1:28, this court affirmed the Superior Court judgment. Two days after the Appeals Court decision, the Foundry paid Roy the remainder of his 1994 bonus of $11,931.50 (a portion of which had been held pending litigation). On March 22, 1996, Roy made a written demand for payment of the December 31, 1990, promissory note. On June 13, 1996, Roy's counsel sent the Foundry a letter pursuant to G. L. c. 93A complaining about the failure to pay the note, wrongful dismissal, and "malicious interference with employment." The Foundry's timely response offering settlement was rejected, and the present action ensued.

In the fall of 1996, Ronald asked Earl to leave the company and reminded Earl that he, Ronald, had the shares that gave him control over the corporation. In January of 1997, Earl resigned as officer, director, and employee of the Foundry. In February of 1997, Dennis Charlette was elected to succeed Earl as director and vice-president. In March of 1997, the directors met, and by majority, affirmed the termination of Roy.

*Discussion.* The Foundry claims that the trial judge erred in ruling in favor of Roy on his claim under the promissory note and against it on the self-dealing counterclaim. The Foundry argues that the judge's findings are inconsistent, contrasting her findings that Roy had authority to execute the note and had not previously overcompensated himself against her related finding that Roy engaged in impermissible self-dealing by setting his own compensation without corporate approval. The defendants also argue that claim preclusion barred Roy's promissory note cause of action.

1. *Standard of review.* We review this case under the well-established standards applicable to civil cases heard by a judge without jury, accepting the judge's findings of fact as true unless clearly erroneous. Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). *Kendall* v. *Selvaggio*, 413 Mass. 619, 620-621 (1992). "A finding is 'clearly erroneous' when although

---

[5]Earl and Ronald elected Ronald as president, treasurer, and clerk; Earl as vice-president; and Madeleine as assistant treasurer.

[6]Ronald, Earl, and Madeleine were elected as directors.

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *J.A. Sullivan Corp.* v. *Commonwealth,* 397 Mass. 789, 792 (1986), quoting from *United States* v. *United States Gypsum Co.,* 333 U.S. 364, 395 (1948). Such review "is circumscribed by the deference [we] must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." *Buster* v. *George W. Moore, Inc.,* 438 Mass. 635, 642 (2003), quoting from *Starr* v. *Fordham,* 420 Mass. 178, 186 (1995). If challenged findings are supported by any "reasonable view of the evidence, including all rational inferences," they ought to stand. *Id.,* quoting from *Judge Rotenberg Educ. Center, Inc.* v. *Commissioner of the Dept. of Mental Retardation (No. 1),* 424 Mass. 430, 452 (1997).

As to matters of law, however, "we scrutinize without deference the legal standard which the judge applied to the facts," such that "the 'clearly erroneous' standard of appellate review does not protect findings of fact or conclusions based on incorrect legal standards." *Kendall* v. *Selvaggio,* 413 Mass. at 621, citing *Marlow* v. *New Bedford,* 369 Mass. 501, 508 (1976).

2. *The promissory note claim.* The Foundry argues that the promissory note held by Roy was not valid because its issuance was not authorized.

The trial judge found that Roy did not obtain express authorization from the board of directors and shareholders for any of the bonuses he paid either to himself or to the others. The judge found, however, that there was an understanding among the directors and shareholders (formally adopted at the May 14, 1992, meeting) that such bonuses be paid. Thus, the judge ruled that the note held by Roy which reflected unpaid bonuses was in accordance with the understanding and agreements of the shareholders and officers and was valid. The judge's ruling was supported by the evidence and was not clearly erroneous.

3. *Breach of fiduciary duty counterclaim.* In addition to an allegation that the promissory note was not collectible because it had not been authorized, the Foundry alleged that the note had

already been paid because Roy set an unauthorized and unreasonable amount of compensation for himself.

The judge found that there was no evidence whatsoever of any authorization, agreement, or understanding by the board of directors and shareholders with respect to the level of Roy's compensation.

Officers, directors, and shareholders in a closely held corporation are charged with the fiduciary duty of the "utmost good faith and loyalty." *Donahue* v. *Rodd Electrotype Co. of New England*, 367 Mass. 578, 593 (1975). Accordingly, corporate fiduciaries are prohibited from engaging in self-dealing. See *Geller* v. *Allied-Lyons PLC*, 42 Mass. App. Ct. 120, 122-123 (1997). Setting one's own level of compensation, without corporate approval, is a form of self-dealing. See *Crowley* v. *Communications for Hosps., Inc.*, 30 Mass. App. Ct. 751, 757-758 (1991). Such self-dealing will be subjected to close scrutiny by the court. See *Geller* v. *Allied-Lyons PLC*, 42 Mass. App. Ct. at 123. Here, Roy did not disclose to or obtain approval from the other directors and shareholders, and the burden was on him to prove that his actions in setting and paying of his own salary "were intrinsically fair, and did not result in harm to the corporation." *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 529-530 (1997).

The judge ruled that Roy had met his burden of proving that his compensation was reasonable and intrinsically fair. The judge noted that Roy had been president of the Foundry and worked full-time at the business. He was the Foundry's most senior and most experienced employee. The judge found that the fact that "the Foundry profited during his years as President is evidenced by the magnitude of the bonuses that were distributed to everyone during those years." The judge ruled that Roy's setting of his own level of compensation did not harm the corporation and was well within what the corporation could afford.

We agree with the judge that "[a]lthough he [Roy] should not have bypassed corporate approvals, the actual amounts were well within the range of reasonable compensation to which he was entitled." Therefore, Roy's self-dealing, with respect to his compensation, passes close scrutiny.

4. *Whether the promissory note claim was barred by claim preclusion.* The Foundry claims that Roy's promissory note claim is barred by claim preclusion because it should have been included in his petition for receivership as a separate count to recover on the note.[7]

Claim preclusion forecloses the litigation of all matters that could have or should have been litigated in a prior action. See *Gloucester Marine Rys. Corp.* v. *Charles Parisi, Inc.*, 36 Mass. App. Ct. 386, 391 (1994), citing *Ratner* v. *Rockwood Sprinkler Co.*, 340 Mass. 773, 775 (1960); *Bendetson* v. *Building Inspector of Revere*, 36 Mass. App. Ct. 615, 618 (1994). For claim preclusion to apply, three elements are required: (1) the identity or privity of the parties to the present and prior actions; (2) identity of the cause of action; and (3) prior final judgment on the merits.[8] *Gloucester Marine Rys. Corp.* v. *Charles Parisi, Inc.*, 36 Mass. App. Ct. at 390.

With respect to the second element, claim preclusion will apply even though a party is prepared in a second action to present different evidence or legal theories to support his claim or seeks different remedies. See *Bendetson* v. *Building Inspector of Revere*, 36 Mass. App. Ct. at 619, citing *Heacock* v. *Heacock*, 402 Mass. 21, 23 (1988). "Whether the facts are related in origin or motivation and whether. they form a convenient trial

---

[7]We consider the affirmative defense of claim preclusion properly asserted here where the defendants raised the issue in their answer to the plaintiff's complaint, in their motion to dismiss the plaintiff's complaint, and in their motion for summary judgment. See *Bendetson* v. *Building Inspector of Revere*, 36 Mass. App. Ct. 615, 620 n.9 (1994). Cf. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 (1991) (where party did not plead waiver as affirmative defense *and* issue not raised or considered in trial court, defense could not be raised for first time on appeal).

[8]With respect to *issue* preclusion, which bars subsequent relitigation of the same issue by the same parties, there is an additional requirement that the issue decided in the prior adjudication must have been "essential to the earlier judgment." *TLT Constr. Corp.* v. *A. Anthony Tappe & Assocs.*, 48 Mass. App. Ct. 1, 5 (1999).

The "essential" requirement is not necessary for *claim* preclusion. Compare *Treglia* v. *MacDonald*, 430 Mass. 237, 240-241 (1999); *Jarosz* v. *Palmer*, 436 Mass. 526, 530-531 (2002); and *Green* v. *Brookline*, 53 Mass. App. Ct. 120, 123-124 (2001), with *DaLuz* v. *Department of Correction*, 434 Mass. 40, 44-45 (2001); *Gloucester Marine Rys. Corp.* v. *Charles Parisi, Inc.*, 36 Mass. App. Ct. at 390-392; and *Bendetson* v. *Building Inspector of Revere*, 36 Mass. App. Ct. at 618-620.

unit are among the considerations." *Saint Louis* v. *Baystate Med. Center, Inc.*, 30 Mass. App. Ct. 393, 399 (1991). "The statement of a different form of liability is not a different cause of action, provided it grows out of the same transaction, act, [or] agreement, and seeks redress for the same wrong." *TLT Constr. Corp.* v. *A. Anthony Tappe & Assocs.*, 48 Mass. App. Ct. 1, 8 (1999), quoting from *Mackintosh* v. *Chambers*, 285 Mass. 594, 596 (1934).

Here, after comparing the claims in the prior receivership litigation with the claims in the present action, it is clear that the first and third prerequisites of claim preclusion are met. The questions then are whether there existed an identity of the cause of action and whether that cause of action could have been litigated in the prior receivership action. The defendant argues that the issue of Roy's claimed entitlement to payment of the note was a "significant motivating purpose behind [his] filing of" the receivership action. Thus, the defendant argues, Roy had the motivation and opportunity to include a separate count to recover on the note in his petition for receivership, but failed to do so.

"A receivership is an equitable remedy designed to protect and preserve the assets of a corporate debtor for those creditors who the court ultimately decides are entitled to them." Shapiro, Perlin, & Connors, Collection Law § 13.1 (3d ed. 2000). See *New England Theatres, Inc.* v. *Olympia Theatres, Inc.*, 287 Mass. 485, 492 (1934), cert. denied sub nom. *E.M. Loew's, Inc.* v. *New England Theatres, Inc.*, 294 U.S. 713 (1935); *Lopez* v. *Medford Community Center, Inc.*, 384 Mass. 163, 169 (1981); *Jae Corp.* v. *Massachusetts Port Realty Co.*, 3 Mass. App. Ct. 704, 704 (1975).

The appointment of a receiver is incidental to other relief requested by a plaintiff. *Goldfine* v. *United States*, 300 F.2d 260, 263 (1st Cir. 1962); *Nigro* v. *First Natl. Bank of Boston*, 7 Mass. App. Ct. 903, 904 (1979), because such an appointment seeks to preserve property until the court can adjudge the parties' rights. See *New England Theatres, Inc.* v. *Olympia Theatres, Inc.*, 287 Mass. at 494; *Nigro* v. *First Natl. Bank of Boston*, 7 Mass. App. Ct. at 904. Because receivership seriously interferes with a defendant's property interests, a judge should

appoint a receiver only if he sees no other way to protect the plaintiff and other creditors. See *George Altman, Inc.* v. *Vogue Intl., Inc.,* 366 Mass. 176, 180 (1974); *Lopez* v. *Medford Community Center, Inc.,* 384 Mass. at 169; *Judge Rotenberg Educ. Center, Inc.* v. *Commissioner of the Dept. of Mental Retardation (No. 1),* 424 Mass. at 463-464. Receivership is not solely for the benefit of the petitioning creditor or creditors. See *New England Theatres, Inc.* v. *Olympia Theatres, Inc.,* 287 Mass. at 494; *George Altman, Inc.* v. *Vogue Intl., Inc.,* 366 Mass. at 179.

As evidenced by Massachusetts case law, receivership is not meant to *determine* or *confer* liability on the corporation or order payment of debts. Rather, receivership is a prophylactic measure to protect assets, *in the event that* a particular creditor can prove that the corporation is liable on a debt. Here, when the plaintiff sought the remedy of receivership, he sought to protect the corporate assets of the Foundry for any and all creditors. By filing the within action, the plaintiff sought to establish the Foundry's liability on a debt to *him.* Such liability, however, in these circumstances, would not and could not have been pursued in the petition for receivership. Cf. *Fusco* v. *Rocky Mountain I Invs. Ltd. Partnership,* 42 Mass. App. Ct. 441, 448-451 (1997). As such, the plaintiff's claims in this action were not barred by the adjudication of the prior receivership action.

*Judgment affirmed.*