McEvoy, Christine M., J.
This matter came before the Court for a jury-waived trial. The Plaintiff Trade Stock America, Inc., (TSA) brought this action against the Defendant Michael Millette (Millette) claiming that Millette breached his fiduciary duties to the corporation by diverting corporate funds for his own use by numerous means, inter alia paying himself an unauthorized salary and an unauthorized bonus, as well as making unauthorized health insurance payments, paying personal expenses from corporate funds, by not funding the corporation with his commissions from trading stock and by failing to contribute specified amounts to the corporation as agreed. The Plaintiff is seeking an accounting and money damages.

FINDINGS OF FACT

In the year 1999, the interaction between the defendant Millette and a group of investors began. This relationship formed the basis for the formation of the plaintiff corporation. Initially, the defendant who was a licensed securities broker at the time met with a group of people, some of whom were his clients and some of whom were not. The defendant Millette was a licensed agent and principal of Sunstate Equity Trading, Inc. (“Sunstate”) and at all times relevant to this action, a licensed securities broker registered with the National Association of Securities Dealers (“NASD”) and the Securities Division of the Secretary of the Commonwealth of Massachusetts (“Securities Division”). Millette operated a branch office of Sunstate, in Burlington, Massachusetts. As a licensed representative, Millette bought and sold securities for clients and was paid commissions by Sunstate for these transactions.
It was originally agreed by the investor group that they, including Millette, would each contribute $35,000 and that the monies would be pooled, turned over to Millette as a loan in order to grow and maintain Stock USA-Boston as a direct access brokerage business, said business to begin on September 29, 1999. In or around October of 1999, Yale Turner (“Turner”), Joseph Scalia (“Scalia”), Edward Goodman (“Goodman”), John Power (“Power”) and David Clark (“Clark”) (collectively referred to as “Investors”), collectively loaned Millette $130,000, (“Loan”) which loans were evidenced by loan agreements.
The Investors made the Loan for the purpose of funding all costs necessary to set up and run the branch office of Sunstate, which was to be moved from Burlington to Needham. The loan amounts broke down as follows: Turner paid $35,000; Scalia paid $25,000; Goodman paid $35,000; Powers paid $17,500; Clark paid $17,500. All of these monies were turned over to Millette who deposited them in his account “Millette Capital.”
On November 12, 1999, there was a further agreement wherein Turner, one of the original parties (Exh. 2), agreed to lend Millette $35,000 to be converted to a 20% equity position in Millette Capital and any new business entity created by its operations. Until the loan is repaid there was a salary structure of $2000 per month beginning May 1, 1999. There were additional terms in said agreement. This agreement, if enforceable, is not a corporate agreement and therefore is relevant only as it relates to whether Millette *438 subsequently contributed his share to the funds which were loaned to the corporation and subsequently forgiven upon the issuance of the stock. See infra.
The new business was created as a branch office for Sunstate with Millette being the manager. On December 29, 1999, Millette met with attorney Jay Pabian of Keegan, Werlin & Pabian (“Pabian Firm”) to incorporate the business under G.L.c. 156B and it was named Trade Stock America, Inc. (‘TSA”) (Exh. 4), a Sub-chapter S corporation effective December 30, 1999. Attorney Pabian had been suggested by Turner. Millette was designated President, Treasurer and Director. Three other Directors and a Clerk were also named. All concurred in these decisions. One thousand shares of stock were issued “Fully Paid and Non-Assessable common stock” 20% of which was issued to Millette, and the remainder proportionally to the original investors (200 shares (20%); Turner — 250 shares (25%); Scalia — 200 shares (20%); Goodman— 200 shares (20%); Clark — 100 shares (10%); Power— 50 shares (5%)). Millette never deposited into the corporation the $35,000 which he borrowed from Turner. It had been agreed that the loans from the original investors would be forgiven upon issuance of the stock.
From the monies that Millette deposited from the loans into the Millette Capital account, he transferred only $88,780.29 into the TSA account. This left a shortfall of $41,219.71 which belonged to the corporation. He spent some monies in setting up the office, but based on the evidence I do not accept the uncon-troverted testimony of the defendant and find the amounts of the expenditures not credible. Furthermore, whatever their value, Millette retained these assets.
There was no written shareholder agreement. There was no written employment agreement between Mill-ette and TSA. At the same time that TSA was being formed, the Sunstate branch operation was moved to an office in Needham. The landlord required an individual to sign the lease and to be responsible for the payments. Millette put his name on the lease without protest and with implied consent. There was an oral agreement whereby Millette agreed to repay an amount equal to the initial investment of the Investors through dividend payments. Other than the initial investments, the only funds that came into TSA were those of securities trade commissions paid by Sunstate to Millette, individually and any income from investments of those funds.
The commissions were earned by Millette and by the brokers that he managed out of the Needham office. There was no other clear agreement about the length of time that Millette would be contributing his Sunstate commissions to TSA or how much of those funds would be paid directly to the Investors once an amount equal to the initial investments were paid out to the Investors. However, this was the sole funding for the corporation other than the initial loans.
Eventually, at different points in time, Powers sold half of his shares to Turner for $17,500, who in turn sold the shares formerly held by Powers to TSA for $25,000; Clark sold all of his shares to Millette for $1.00 and Scalia sold all of his shares back to TSA for $11,000.
Mr. Millette who was President, Treasurer and Chairman of the Board of Directors decided his own salary which was recorded in the corporation books. In year 2000, he took a salary of $106,424.19 and in 2001, a salary of $89,197.88. These salaries were never voted upon by the Board of Directors. He also awarded himself a mid-year bonus of $3000 on September 7, 2001 without the authority of the Board of Directors, who demanded same to be returned.
In the year 2000, Mr. Millette received $864,564.69 in commissions from Sunstate Equity Trading and in 2001, he received $447,329.32. In the year 2000, he turned over $861,239.63 to the corporation and in year 2001, he turned over $352,286.92. Therefore, in the year, 2000, $3,325.06 was not turned over from commissions and in the year 2001, $95,042.40 was not turned over from commissions.
Millette also used company funds to pay for his personal expenses, including payments to American Express of $30,834.41 total in the years 2000 and 2001. He also paid Blue Cross and Blue Shield payments from the corporate accounts for seven months at $779.98 per month for a total of $5,459.86, which had not been approved by the Board. Additionally, he paid rent for an office in Burlington which he had used before the corporation was formed in the amount of $2,616.64 from corporate funds. He also paid William Popkin, the corporation’s accountant, the amount of $280 for preparation of his personal income tax for year 1999.[1]
Shortly after the formation of TSA, Millette and the Investors also agreed that Millette would deposit an unspecified additional amount of Sunstate monies into three securities accounts in the name of TSA so that the Investors could trade in securities using TSA’s money. All shareholders were to share in the gains and losses of those accounts. Monies were transferred from TSA money accounts into trading accounts beginning in March 2000 and ending in July of 2001. The TSA trading accounts have since been zeroed out after experiencing large losses with the decline in the stock market at the end of 2000 and the beginning of 2001.
The original investors received amounts exceeding that of their initial investments. The breakdown is as follows:
Joseph Scalia
Original Loan/investment -$25,000.00
2000 Distributions: +$40,447.00
2001 Distributions: +$ 5,211.82
*439 Profits from sale of shares to TSA +$11.000.00
Total payments to J Scalia ($31,658.82 net gain over investment) +$56,658.82
Ed Goodman
Original Loan/investment -$35,000.00
2000 Distributions: +$40,447.00
2001 Distributions: +$ 5.211.82
Total payments to E Goodman ($10,658.82 net gain over investment) +$45,658.82
John Power
Original Loan/investment -$17,500.00
2000 Distributions: +$10,112.00
2001 Distributions: +$ 1,302.96
Profit from sale of shares to Turner +$17,500.00
Total payments to J Power ($11,414.96 net gain over investment) +$28.914.96
David Clark
Original Loan: -$17,500.00
2000 Distributions: +$20,223.00
2001 Distributions: +$ 1,220.91
Profit from sale of shares to Millette +$_L
Total payments to D Clark ($3,944.91 net gain over investment) +$21,444.91
Yale Turner
Original Loan: -$35,000.00
2000 Distributions: +$59,977.00
2001 Distributions: +$ 5,211.82
Cost of purchase of stock from Power -$17,500.00
Sale of former Power shares to TSA $25.000.00
Total payments to Y Turner ($37,688.82 net gain over investments) +$90,188.82
Total Loans — initial investments: $130,000.00
Total investor groups’ net gains $ 95,366.33
TSA was not a registered broker/dealer under any state or federal securities laws. At the outset Millette, who did hold a securities registration, would run the TSA securities business. The business, which was going well, appeared to be running smoothly and the stock holders were receiving satisfactory returns on their initial investments. However, at the end of 2000 and the beginning of 2001 payments to investors began to slow down in the wake of the then bear market. At that point, certain of the investors began to more closely observe how Millette was running the business. Up to this point, there was very little involvement by the Board.
In March of2001, after the initial investments were repaid, in response to the Investors attempting to exert more control over the manner in which Millette was running TSA, Millette retained counsel to advise him regarding his options to separate from TSA. At that point, Millette stopped contributing his Sunstate securities commissions to the TSA account. Millette’s personal counsel brought in another attorney with an expertise in securities law who, in May 2001, advised Millette that it was a violation of state and federal securities laws for him to share his Sunstate securities commissions with TSA, a non-registered entity. Millette’s counsel wrote to the TSA corporate counsel at the Pabian Firm on June 1, 2001 to explain that it was illegal for Millette to contribute his Sunstate securities commissions to TSA. This was apparently unknown to all at the time of the initial agreement.
At some point, Turner filed a complaint with the Massachusetts Securities Division against Millette relating to Millette’s activities with TSA. Subsequently, the Securities Division began an investigation, culminating in January 2003 with a Consent Order requiring Millette to pay a civil fine of $5,000 and to cease and desist his illegal activities, including: (i) running a securities business out of TSA, a non-registered entiiy, and (ii) sharing commissions with TSA, a non-registered entity, in violation of the state securities laws.

RULINGS OF LAW

At the conclusion of the plaintiffs case, and then again at the end of the submission of all of the evidence, Millette moved for a directed finding on the grounds that the relief being sought by the Plaintiff, TSA, cannot be granted as a matter of law. Millette’s Motion is allowed in part and denied in part.
To the degree that TSA’s claims seek Millette’s Sunstate securities commissions to become corporate assets, as a matter of law, that agreement cannot be enforced. See O’Donnell v. Bane, 385 Mass. 114, 117 (1982) The law cannot contribute to an illegality. See Nussenbaum v. Chambers & Chambers, Inc., 322 Mass. 419, 421-22 (1948). However, the law can look to the equities of the situation, in order to avoid an unfair result. See Town Planning & Eng’r Assocs. Inc. v. Amesbury Specialty Co., Inc., 369 Mass. 737 (1976). The Court must look to all the circumstances in order to consider and evaluate what the consequences of the illegality should be. Some of those factors are what was the nature of the subject matter of the contract, what was the extent of the illegal behavior, was the behavior a material or only an incidental part of the performance of the contract, what was the strength of the public policy underlying the prohibition, how far would effectuation of the policy be defeated by denial of an added sanction, how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant’s windfall. Id. at 745.
The Massachusetts Uniform Securities Act, G.L.c. 110A, precludes an agent of a registered broker-dealer from paying any portion of his commissions from the sale of securities to an unregistered entity. Specifically, 950 CMR 12.204 prohibits dividing or otherwise splitting the agent’s commissions, profits or other compensation from the purchase and sale of securities with any person not also registered as an agent for the same broker-dealer, or a broker-dealer under direct or indirect common control. 950 CMR 12.204(b)(5). Such acts and practices, including, but not limited to, the following, are considered contrary to such standards and constitute dishonest or unethical practices in the securities industry and are thereby grounds for imposition of an administrative fine, censure, denial, sus *440 pension or revocation of a registration or such other action as is appropriate. Id. at (b).
Michael Millette entered into a Consent Order dated January 24, 2003 with the Securities Division of the Commonwealth. In said order, he agreed to cease and desist from further violation of said act, and agreed to a censure and fine for violations of sections 201 and 204. This was found to be in the best interests of the public and the protection of investors. The issue before this Court then becomes whether violation of this act is the type of illegality which would prevent recovery under a claim for breach of fiduciary duty to a corporation. Consideration of the above factors leads this Court to the following conclusions.
Michael Millette as a corporate officer and director was a fiduciary with respect to the affairs of the corporation. The original agreement and corporate purpose was that Trade Stock America would be run by Millette and his commissions were to become corporate assets, and that dividends were to be paid to the shareholders based upon the corporate profits. TSA now seeks to enforce said agreement and also to recover certain other monies which TSA claims were improperly taken by Mr. Millette for unauthorized purposes and for personal expenses. TSA is not a registered securities broker or dealer under either state or federal law, and therefore, this Court cannot enforce TSA’s direct claim to Millette’s Sunstate securities commissions. However, that having been said, TSA’s claim does not totally fail.
The corporation had a common-law right to recover for an officer or director’s breach of his fiduciary duties. It is well settled that a corporate officer and director owes a fiduciary duty to the corporation. See Charlette v. Charlette Brothers Foundry, Inc., 59 Mass.App.Ct. 34,43 (2003). Said duty is of the “utmost good faith and loyalty.” Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 593 (1975). Although this court will not enforce an illegal agreement, it can, looking at all the circumstances, fashion relief which is commensurate with the wrongs alleged and the facts as proven at the trial, in order to avoid an unjust result. Here, Millette agreed to direct and perform the corporate function, which was to trade in stocks, and he breached that duty by not contributing those funds to the corporation. Therefore, he breached his fiduciary duly to the corporation as both an officer and director. However, 950 CMR 12.204(l)(b)(5) states that a registered agent shall not engage in:
Dividing or otherwise splitting the agent’s commissions, profits or other compensation from the purchase and sale of securities with any person not also registered as an agent for the same broker-dealer under direct or indirect common control.
G.L.c. 110A, §409, provides that a violation of any rule promulgated under Chapter 110A, such as 950 CMR 12.204(l)(b)(5), is a felony punishable by a fine not more than $100,000 and, if committed with knowledge of the existence of the rule being violated, the punishment may include imprisonment for not more than 10 years in the state prison. None of the original investors including Millette had knowledge that the rule was being violated. Millette became aware of same when he conferred with his securities counsel in March 2001, and subsequently sanctioned by the Massachusetts Securities Division in January 2003, Millette is now aware of the law prohibiting him from sharing securities sales commissions with a non-registered entity. Thus, any order requiring Millette to disgorge the securities sales commissions that he received from Sunstate and pay them to TSA would be illegal and would subject Millette to a felony prosecution. However, Millette should not be able to retain all of the benefits of the illegality when his conduct breached his fiduciary duty to the corporation.
Therefore, based on his failure to contribute all commissions to TSA, it seems to this court that Mill-ette should not be entitled to both retention of the corporate assets and a salary for the period of time when he did not contribute those commissions. Although there are different methods of computation, this Court will divide proportionally the salary for the year against the amount of the commissions and shortfall, and assume an equal distribution throughout the year. Although this method is imperfect, it is impossible to pinpoint for year 2000, when the shortfall occurred and for what period of time it was earned, and although not as difficult in 2001, consistency should triumph over using an alternate means of calculation.
The plaintiffs have claimed that the defendant’s salary was unauthorized and the defendant claims that it was a reasonable salary in light of all the circumstances. There is no question that there was no express approval of this salary. Therefore, the defendant has the burden of proving that his compensation was reasonable and intrinsically fair. The defendant has met that burden. Millette worked full time for the corporation, generated a very large amount of revenue, and handled a large volume of trades, which were reflected in those commissions. He hired and supervised employees, kept the corporate books, met with the accountant and was responsible in every way for the day-to-day operations of the office. This Court rules that the defendant has met his burden of proof that his salary for years 2000 and 2001 was justified, intrinsically fair and did not result in harm to the corporation, except as set forth herein. See Charlette, supra, at 43. Furthermore, by it being included in the corporate books, the corporation was aware of it, and implicitly approved it.
The salary amount earned by Millette for 2000, was $106,424.19 for a twelve-month period. In 2001, the salary was $89,197.88 and again assuming a twelvemonth period was used. Therefore, the salary for year 2000 will be reduced by the amount of $2,800.63, and *441 the salary paid for the year 2001, will be reduced by the amount of $18,951.54.[2] To the degree that. Millette paid any expenses from these commissions, this Court finds and rules that those expenses were directly or indirectly Millette’s own expenses and he was not acting in the corporations’ business but in his own at that time. Thus, this Court is not enforcing the agreement per se, which appears to violate the Securities Act, but is proportionally reducing the amount of compensation paid by the proportionate amount of time that Millette was not performing corporate work.
In regard to the remaining claims ofTSA, based on the above found facts, this Court hereby rules that Millette violated his fiduciary duty to the corporation by paying his personal American Express bills in the amount of $30,834.41; by making unauthorized Blue Cross Blue Shield payments in the amount of $5459.86; by paying rent in Burlington for non-corporate business in the amount of $2616.64; by paying personal accounting expenses in the amount of $280 and by paying an unauthorized bonus in the amount of $3000. See generally Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501 (1997). In regard to the rent paid in Needham for the office, again that rent should be reduced by that period of time respectively that he was not engaged in corporate business, i.e. retaining his commissions. Again, applying the same formula as above,[3] the reduction in rent for year 2000 (total rent paid $22,750.) would be $86.45 and in the year 2001 (total rent $15,750.), the amount of $3,339. Finally, the amount of the shortfall from the initial loan to the corporation which Millette was to pay was $41,219.71. Millette claims to have contributed same in kind, however, there was no credible evidence of the value of what was contributed or purchased and therefore, the full amount of the shortfall is to be assessed against Millette. This loan was to be in return for the issuance of stock to Millette, which did in fact occur. Accordingly, TSA has proven a breach of fiduciary duly arising out of Millette’s alleged failure to pay for his stock.
This Court is not ruling that the amount of Millette’s salary was unreasonable, see Charlette v. Charlette Brothers Foundry, Inc., 59 Mass.App.Ct. 34 (1993) (holding that the president of the corporation should not have bypassed corporate approvals, but also holding that the actual amounts of his salary were well within the range of reasonable compensation to which he was entitled and well within the range of what the company could afford given its profitability), but rather that during part of2000, and a substantial part of2001, he was not engaged in corporate work. Therefore, using the amount of commissions as a proportional guide, this Court has reduced his salary accordingly. If he was not turning over commissions, he was not trading for TSA. Millette’s benefits and bonus were unauthorized and did result in harm to the corporation. Therefore, Millette breached his fiduciary duty by paying himself these benefits. Simply because something appears in a corporate ledger or book does not convert an unauthorized expenditure into a lawful one. Accordingly, TSA has proven a breach of fiduciary duly arising out of Millette’s payment to himself of excessive salary as explained supra and unauthorized benefits. TSA has proven a breach of fiduciary duty arising out of Millette’s alleged use of TSA funds for private uses that did not benefit TSA. TSA has also proven that Millette failed to turn over loan monies and contribute his own loan monies to the corporation as promised in return for the issuance of stock.

JUDGMENT AND ORDER

It is hereby ordered that judgment be entered in favor of the plaintiff corporation TSA and against the defendant Michael Millette in the amount of One Hundred Eight Thousand, Five Hundred Eighty-Eight and 24/100 ($108,588.24) Dollars.

Mr. Popkin, who was initially recommended by Mr. Goodman, established TSR’s books and records and was engaged to set up payroll and to handle all tax matters and filings. Popkin also conducted periodic audits of TSA’s books and records and made reports of his audit to the Investors. The assets ofTSA were tracked in a QuickBooks ledger as well as the purported income and expenses ofTSA. These electronic books and records were kept on the hard drive of Millette’s computer in the Needham office, to which the accountant was given access.

Factor which is being used is .0038 for 2000, 0.212 for 2001.

See footnote 2 supra.