McCann, John S., J.
INTRODUCTION
Hilti, Inc. (Hilti) is represented by Jerrold N. Arnowitz, Esq. (Amowitz). The receiver is Peter L. Zimmerman, Esq. (Zimmerman). HML Development Corp. d/b/a HML Development Company (HML) and James Xarras a/k/a Jimmy Xarras (Xarras) are represented by John M. Dombrowski, Esq. (Dombrowski).
BACKGROUND
This is a 1998 receivership collection case in which plaintiff, Hilti, Inc. (“Hilti”) petitioned this court to appoint attorney Peter Zimmerman (“Zimmerman”) to act as a statutory Receiver pursuant to G.L.c. 156(b) §105, to assist in collecting on a judgment that Hilti secured against the defendant, HML Development Corp. (“HML”).
Hilti is a foreign corporation having a usual place of business in Pittsburgh, Pennsylvania. HML was a closely held corporation and is a now defunct[1] Massachusetts corporation which had a usual place of business in Leominster, Massachusetts. HML formerly conducted business as a drywall contractor. James L. Xarras (“Xarras”) was the sole shareholder, director and officer of HML. He is sometimes referred to as Jimmy Xarras.
The Complaint was filed on May 5, 1998. The receiver was appointed March 29, 1999.
In April 2006, seven years after Zimmerman’s appointment as Receiver, HML filed a motion asking this court to replace the Receiver, alleging that Zimmerman, as receiver, and Hilti’s counsel, had breached their fiduciary duty to HML, by conspiring to use the assets of the receivership to enrich themselves, while failing to liquidate and make timely payments to HML’s creditors.
On May 15, 2006, the court, on a hearing for the approval of the fifth account by the receiver, ordered that the fees of Zimmerman and Amowitz be placed in an interest-bearing escrow account with Arnowitz and Dombrowski as co-escrowees and fees of Zimmerman to be deposited likewise in that account until further order of the court without prejudice (Murphy, J.).
Murphy, J. referred the matter to the Regional Administrative Justice who at the time of the further hearing was McCann, J. After a hearing on September 19, 2006 (McCann, J.), the following motions were taken under advisement: (1) HML’s Motion to Replace the Receiver; (2) Zimmerman’s Motion for Reconsideration of the Escrow of his Fees; and (3) Arnowitz’s Motion for Reconsideration of the Escrow of his Fees and Cross Motion for costs.[2] Now before the court is HML’s Motion to Remove the Receiver and the Emergency Motion of Amowitz for Reconsideration Seeking a Stay of the Court’s Sua Sponte Order dated May 15, 2006 and the Court’s denial of Amowitz’s Motion for Reconsideration. Amowitz also filed a Notice of Appeal of the Order of McCann, J. dated March 13, 2006. For the following reasons HML’s Motion to Replace the Receiver is allowed; Arnowitz’s Emergency Motion In Reconsideration is denied; the Cross Motion of Amowitz for Costs is denied; the Request for a Stay of the Order of Murphy, J. dated May 15, 2006 and the *210 Order of McCann, J. dated November 9, 2006 are denied.
The District Court Judgment
On May 29, 1997, Hilti brought a breach of contract suit against HML in the Leominster District Court. On November 14, 1997, Hilti recovered ajudgment in the amount of $26,139.99. The District Court issued an execution on November 24, 1997, execution issued and served on HML by service on Xarras on January 12, 1998. Neither HML nor Xarras on behalf of HML made any payments and failed to satisfy the execution within the required thirty (30) day period.
Oneyear later, on May 5, 1998, Hilti filed this action in Worcester Superior Court against HML as the sole defendant, asking this court to appoint a Receiver[3] for HML pursuant to G.L.c. 156(b), §105.[4] Service was made on HML on May 8, 1998, with service returned on May 12, 1998. At the time this complaint was filed, Xarras was not named individually as a defendant in this action, and could not have been because he individually was not ajudgment debtor. Hilti is represented in this action by Jerrold Arnowitz (“Arnowitz”) of Arnowitz & Goldberg (“A&G”) in Boston.[5]
On May 21, 1998, Xarras, individually, filed a pro se answer to Hilti’s complaint even though he was not named a party defendant.[6] On December 1,1998, Hilti filed a Motion to Amend Complaint to Add Reach and Apply Defendant Xarras, individually. This motion was allowed on December 4, 1998, pursuant to Superior Court Rule 9(a), with no opposition to the motion having been filed. At this point in the proceedings there does not appear there was any party who had been served to oppose the motion. It does not appear there was ever an attempt to make service on Xarras as a reach and apply defendant and the record does not reflect any service on Xarras.
The Appointment of Zimmerman as Receiver
Early on in the hearing for the appointment of a Receiver, the petition was continued a number of times between September 1998 and March 1999 for reasons not apparent on the record. The hearing on the appointment of a Receiver finally took place ten months after the filing of the Complaint on March 19, 1999. Hilti’s motion to appoint Zimmerman of the law firm of Silverman & Kudisch, P.C. (“S&K”) in Boston, was allowed (Toomey, J.).[7] Subsequently, Zimmerman filed a statutory receiver’s bond of $500.00 with this court on March 29, 1999.
On April 14, 1999 Zimmerman notified Xarras by certified mail that he had been appointed as Receiver of HML by this court, and requested that all records and assets of HML be transferred to him by April 23, 1999. Zimmerman requested that Richard Kohn (“Kohn”), of Beacon Liquidators & Appraisers (“Beacon”) visit the address of HML at 41 Balsam Drive, in Leominster. Kohn visited this address on April 29, 1999, and gave the company secretary the state receivership papers as Zimmerman requested. Not having heard from Xarras, Zimmerman sent another letter via certified mail on June 15, 1999, ordering Xarras to turn over all records and assets of HML by June 25, 1999. Xarras failed to comply with the court order.
The Assignment of Two HML Mortgages to Receiver
On November 9, 1999, Zimmerman filed a Receiver’s Petition for Authorization to Receive Mortgage Payments Due HML and For Assignment of two (2) Mortgages. In this motion, Zimmerman stated he had examined the land records at the Worcester Counly Registry of Deeds, which had revealed that HML was the mortgagee on two separate properties, one in Westminster, and one in Fitchburg. A mortgage of $327,000 was given by HML to the Sargent Road Realty Trust[8] on March 9, 1992 on the properly located at 88-100 Sargent Road, Westminster (“The Westminster Property”). The Westminster Properly included apartment buildings of twelve units each and a restaurant.
The second mortgage in the amount of $1,232,071.00[9] was given by HML to John C. Pappas and James C. Pappas (“Pappas Brothers”)[10] on a property located at 19-49 Airport Road, in Fitchburg (the “Fitchburg Property”). The Fitchburg Property consisted of a strip mall known as Charles Park Plaza. Zimmerman requested that the two mortgagors be required to make their mortgage payments directly to him, and that said mortgages be assigned to him, with notice filed in the appropriate Registry of Deeds as these payments were assets of HML’s and Xarras’s estate. This request was allowed on March 24, 2000, upon motion filed in this court (Fecteau, J.).
Receiver’s Motion for Contempt
On November 15, 1999, Zimmerman filed a Verified Complaint for Contempt against Xarras for failure to turn over all of HML’s assets and books. A summons for contempt was issued on November 18, 1999, directing Xarras to appear for a hearing on Zimmerman’s contempt motion on November 22, 1999. The hearing was continued until December 7, 1999, by agreement of the parties because Xarras desired to retain counsel. On December 7, 1999, Xarras failed to appear, and by default Zimmerman’s Motion for Contempt was allowed.
On January 13, 2000, Hilti and Xarras filed an assented-to motion to remove the default, on the default entered on Zimmerman’s Motion for Contempt. HML & Xarras’s motion was signed by attorney John M. Dombrowski (“Dombrowski”).[11] This motion was allowed on January 24, 2000. On February 28, 2000, Zimmerman filed a Motion for a Renewed Summons on Receiver’s Complaint for Contempt. On March 10, 2000, Zimmerman filed a Motion for an Order Authorizing the Receiver to Enter the Premises of Petrullo Construction (“Petrullo”). Zimmerman stated that he had information that Petrullo had possession of equip *211 ment and other assets of HML that were being stored at a Petrullo facility. Petrullo failed to respond to Zimmerman’s requests and the motion was allowed on March 24,2000.[12] Petrullo was never added as a party in this action and the record does not reflect that it was served any documents by any party.
HML’s Other Creditor: Suffolk Construction
Suffolk Construction (“Suffolk”) and HML were involved in a breach of contract dispute that began in the early 1990s. On or about July 23, 1993, Suffolk filed suit against HML in Suffolk Superior Court[13] claiming damages in the amount of $122,745. The dispute was heard by a Special Master in October 1995, and on May 17, 1996, the Master entered judgment in favor of Suffolk in the amount of $469,706.00. Final judgment in that amount with interest at the rate of 12% from the date of the filing of the complaint and costs was entered on December 2, 1996 (Bumes.J.). On December 18, 1996, HML filed a notice of appeal, which was dismissed for lack of prosecution on January 7, 1998.
The Suffolk Case: Suffolk Attempts to Collect Judgment
In April 1998, Suffolk retained Arnowitz to help them collect the December 1996 judgment by filing an action in Suffolk Superior Court, Suffolk Construction, Inc. v. HML Development Corp., James Xarras, Quintin Tigs et al. (the “Suffolk case”).[14] Suffolk was also named as a reach and apply defendant. Suffolk was attempting to reach the assets of Xarras based upon claims of fraudulent transfers of corporate assets by Xarras, that Suffolk alleged had the effect of making HML insolvent. Arnowitz joined the law firm of Blank & Solomon (“B&S”) as co-counsel to try the case. In September 2000, Zimmerman filed a Motion to Intervene[15] in the Suffolk case. The Suffolk case went to trial on or about January 21, 2003. In a decision, dated three years later on September 28, 2006, the court entered judgment in favor of HML on all of Suffolk’s claims. On October 10, 2006, Suffolk filed a notice of appeal, which is still pending.
The Suffolk Case Decision
Although the Suffolk case decision is currently under appeal, certain findings from the Suffolk case are relevant to this case. The decision, among other things, stated that,
On August 13, 1993, pursuant to an agreement between the parties, as prejudgment security HML assigned to Suffolk a first mortgage that it held on property located at 202 Park Avenue, Quincy, Massachusetts, [16] which mortgage has a face value of $220,000. In furtherance of this assignment, Suffolk and HML entered into an escrow agreement that provided for all mortgage payments to be held by an escrow agent pending the outcome of the case. The escrow agent was authorized, in the event of any default on the mortgage, to foreclose on the property and to hold all proceeds of the foreclosure pending the outcome of the case.[17]
On October 15, 1998, six months after the initiation of the Suffolk case, Suffolk received $44,212.17 from the escrow agent representing the mortgage payments receivable under the terms of the assignment made as prejudgment security.[18] The court noted that no explanation had been given for the ten (10) month delay in Suffolk receiving these funds, “which resulted in significant 12% interest unnecessarily being assessed against HML.”[19]
On January 8, 1997 the Land Court issued a judgment permitting Suffolk to foreclose on the Quincy Property, but Suffolk did not foreclose on it until September 10, 1999, thirty-three (33) months later. The Quincy Property was sold at a foreclosure sale for $265,000, and these funds were paid to Suffolk on September 14, 1999. As a result, “by September 14, 1999, Suffolk had received a total of $309,212.17 on its judgment of $469,706,” leaving a balance owed to Suffolk by HML of $160,493.83[20] exclusive of interest.[21]
Receiver’s Discovery of Additional Mortgage on the Fitchburg Property
On November 17, 2003, Zimmerman filed a 9(a) Motion for Authorization to Receive Mortgage Payments Due Defendant, for Turnover of Mortgage Proceeds Previously Received and For Assignment of Leases and Rents regarding the Fitchburg Property. In this motion Zimmerman stated that after the trial in the Suffolk case, he was informed by trial counsel, presumably Arnowitz, that there was an additional mortgage on the Fitchburg Property granted by the Pappas Brothers to HML. He stated that the additional mortgage “was on registered land and is part of the same parcel as the mortgage previously assigned to your Receiver in the recorded Land Court section of the Worcester County Registry of Deeds.” In the motion Zimmerman stated that the additional mortgage on the Fitchburg Property “was dated January 17, 1999 and registered in the Land Court as Document No. 6020 from Pappas to HML to secure the payment of $1,232,071 with interest thereon.” This motion was allowed on November 28, 2003 (Agnes, J.).
In its attempt to demonstrate that there is an additional mortgage, the motion refers to an attached Exhibit D, the Mortgage and Security Agreement. However the Mortgage and Security Agreement is dated January 17, 1991, not 1999, and appears to be exactly the same document that was used to refer to the first mortgage that was discovered on the Fitch-burg Property. Thus it is not clear to this court whether in fact there was an additional mortgage on the Fitch-burg Property, as represented to this court by Zimmerman.
*212 The First Intervention of Nicole Moorshead as Trustee
On April 2, 2004 Nicole Moorshead (“Moorshead”),[22] as trustee of the Fitchburg Property, filed an Emergency Motion to Intervene, claiming that she had been the trustee since 2001, had managed the premises since the early 1990s, and was a tenant conducting business on the premises in question. Moorshead claimed that no debt was due HML. After ahearingonApri!2, 2004, the motion to intervene was denied (Agnes, J.). Moorshead filed another Emergency Motion to Revoke Court’s Order Granting Receiver Motion to Receive Mortgage Payments or in the Alternative, to Stay Implementation of Order, which was similarly denied the same day (Agnes, J.).
Receiver’s Status Report
Zimmerman filed a Status Report on April 14, 2004 five years after his initial appointment as receiver. Zimmerman accounted for his actions to date by stating that he had obtained a list of all the tenants at the Fitchburg Property, and notified them that all rents and income should be paid to him. As of April 13, 2004, Zimmerman had received six rent checks from tenants,[23] and was attempting to determine the names and addresses of the remaining tenants who had not paid their rent to him.
Receiver’s Foreclosure on the Westminster Property
Zimmerman became aware that Louise Shea had resigned as Trustee of the Sargent Road Realty Trust and had been replaced by Margo Xarras. On May 14, 2004, Zimmerman sent notice to Margo Xarras of his intention to foreclose on Westminster Property. On June 14, 2004, receiving no response to this notice, Zimmerman filed a motion requesting foreclosure on the mortgage from Sargent Road Realty Trust to HML on the Westminster Property, and for permission to use funds collected from the Fitchburg Property to cover his expenses incurred in the foreclosure proceeding. This motion was allowed on September 13, 2004 (McDonald, J.).
Zimmerman’s First Application for Instructions
Zimmerman filed an Application for Instructions on July 13, 2004, five years after his appointment, requesting permission from the court to use rents received from the Fitchburg Property to pay the insurance and tax bills on that property, “bearing in mind that your Receiver has never taken possession of the Premises as mortgagee in possession.” On July 21, 2004, Moorshead, as sole beneficiary of the Charles Park Realty Trust at the Fitchburg Property, filed a statement in response to Zimmerman’s Application for Instructions consenting to the payment of the outstanding tax and insurance bills on the Fitch-burg Property, as such expenses were necessary to the continued operation of the plaza. This motion was allowed on September 3, 2004 (McDonald, J.). On July 13, 2004, Zimmerman also filed an application for an order requiring all governmental taxing authorities and general unsecured creditors of HML to file proof of claims. This motion was allowed on September 2, 2004 (McDonald, J.), five years after Zimmerman’s appointment as receiver.
Attorney Arnowitz’s Request for Fees and Expenses
On August 6, 2004, Arnowitz, and not Zimmerman who was receiver, filed a 9(a) Motion for Payment of Administrative Fees and For Monthly Interim Payments.[24] In this motion Arnowitz stated that to his knowledge only one other creditor of HML existed, which was Suffolk, whom he also represented. Arnowitz stated that as of June 14, 2004, HML owed Suffolk $1,020,584.32,[25] with a per diem interest of $335.53 or $122,470.10 per annum.[26] Arnowitz further stated that the assignment of the mortgage on the Fitchburg Property on April 11, 2000, had resulted in Zimmerman collecting rents from the tenants in the amount of $15,000-17,000 per month. However, despite the additional mortgage assignment to Zimmerman on the Westminster Property, no mortgage payments had been received from that property, and that Zimmerman was in the process of foreclosing on the mortgage after the Receiver’s foreclosure motion was allowed on June 14, 2004.
Arnowitz stated that it would take seventeen years for the judgment against HML to be paid to Hilti, and that even if there was a foreclosure sale on the Westminster Property. It was his position;
that after the administrative fees and expenses of the petitioning creditor, it’s (sic) counsel, co-counsel and the Receiver are paid from the rental receipts and/or proceeds subject to foreclosure, then the Receiver should commence to pass the rental payments on the Airport Road property through to the creditors of HML and/or their attorneys . . .[27]
As such Arnowitz requested that this court: 1) authorize himself, as counsel for Hilti and intervening creditor Suffolk, and Zimmerman to file initial bills for professional services rendered; 2) that the Receiver Zimmerman be granted a cut-off date for all creditors of HML to come forward with proof of claims; and 3) after administrative payments had been paid, to begin paying the creditors of HML on a monthly basis.
On August 6, 2004 Arnowitz also filed the following 9(a) Motions: 1) Opposition of Moorshead to Plaintiffs Motion for Payment of Administrative Fees and for Monthly Interim Payments; 2) Motion to Strike Moorshead’s Opposition to Plaintiffs Motion For Payment of Administrative Fees and For Monthly Interim Payments and Opposition to Moorshead’s 2nd Attempt to Intervene; 3) Affidavit of Compliance with 9A and Certificate of No Opposition.
In Moorshead’s opposition to Arnowitz’s 9(a) motion for fees and expenses she stated that she was the sole *213 beneficiaiy of the Fitchburg Property.[28] Moorshead opposed Arnowitz’s motion on the basis that no money was owed to the mortgage holder because “no money or other consideration was ever given to create a binding obligation.”[29] Furthermore, Moorshead stated that in the thirteen years since the mortgage was recorded, “no payments were made and ... no demand for payment was ever made by any alleged holder of the Mortgage.” Essentially, Moorshead claimed that despite the presence of a mortgage from the Pappases to HML as an encumbrance of record, no money ever changed hands between the Pappases and HML. In addition, Moorshead took the position that Zimmerman had failed to properly collect rents because he had not taken possession of the Fitchburg Property, and had failed and refused to pay the expenses of the property including the payment of insurance. Amowitz’s Motion for Payment of Fees and For Monthly Interim Payments and Motion to Strike Moorshead’s Opposition was allowed on August 12, 2004 (McDonald, J.).
On August 23, 2004, Moorshead filed a Renewed Motion to Revoke Court’s Order Granting Receiver’s Motion to Receive Mortgage Payments, Or In the Alternative, To Stay Implementation of Order, and For Turnover of All Rents Received and a Renewed Motion to Intervene. Both motions were denied on September 2, 2004 for failure to comply with Superior Court Rule 9(d) (McDonald, J.).[30]
Zimmerman Employs Capitol to Manage the Fitchburg Property
On September 3, 2004, five years after Zimmerman was appointed receiver, Zimmerman filed an emergency motion pursuant to Rule 9(a) to: 1) take possession of the Fitchburg Property; 2) to employ Capitol Realty Group, Inc. (“Capitol”) to manage the premises; and 3) for authority to expend funds for operation of the premises. Zimmerman stated that pursuant to court orders he had begun to collect rent from all the tenants at the Fitchburg Property except Moorshead, who operated two businesses on the premises. Zimmerman stated that Moorshead, as the self-admitted manager of the Fitchburg Property, had failed to maintain the premises resulting in violations from the City of Fitchburg for garbage violations. As such, Zimmerman requested that he be able to foreclose on the mortgage by entry pursuant to G.L.c. 241, §1. Zimmerman also requested that he employ Capitol to manage the Fitchburg Property, for a fee of 8.5% of gross rents, and that he be authorized to pay the ordinary and usual expenses incurred in the operation of the Fitchburg Property without further order of the court.[31] This motion was allowed after a hearing on September 10, 2004 (Kern, J.).
Zimmerman’s First Interim Expense Report
On September 28, 2004, five years after his appointment as receiver, Zimmerman filed his First Interim Report and Request for Payment of Fees and Expenses pursuant to Superior Court Rule 9(a). This report covered the period April 12, 2004 through September 13, 2004. Zimmerman reported that he had collected $89,564.50 in rent from the tenants of the Fitchburg Property. Zimmerman also claimed that between March 24, 1999 and August 31, 2001 (sic)[32] he had accumulated fees and expenses during his work as HML’s Receiver in the amount of $41,462.74.[33] He stated that he had worked 133 hours on the case, and provided documentation detailing the rental receipts from the Fitchburg Property tenants. No disbursements were listed. He also asked the court for permission to pay his fees and expenses from the rent receipts. The First Interim Report was unopposed and was allowed on October 19, 2004 (Kern, J.).
Court Approves Payment of Arnowitz’s Fees From Receivership Estate
Arnowitz had already received the court’s prior approval to pay any fees and expenses that might be incurred by Zimmerman or Arnowitz with regard to HML’s receivership estate.[34] On September 28, 2004, Zimmerman filed a 9(a) Application for Instructions with his first Interim Report in which he noted that Arnowitz had emailed him an invoice requesting payment of administrative expenses in the amount of $20,250.50 from the receivership estate.[35] Attached to the Application for Instructions was a memorandum submitted by Arnowitz in support of the payment of his fees from the HML estate.[36]
Zimmerman petitioned this court as to whether he could use the rent receipts from the Fitchburg Property to pay Arnowitz and for approval of the plaintiffs invoice.[37] Arnowitz claimed in his memorandum that he was only “requesting payment of those fees that it generated which directly resulted in aiding the Receiver in locating, confirming and preserving assets that the Receiver currently has in his possession for the benefit of all the creditors of the estate of HML.” Arnowitz stated that he was not seeking payment for the “numerous hours” of consultation between himself, B&S and the Receiver, but only “for the most direct and proximate efforts associated with the Receiver obtaining and preserving the current estate.” Zimmerman’s motion was unopposed and was allowed on October 19, 2004 (Kern, J.).
An Accounting of Arnowitz’s Fee Request
Arnowitz sought fees from four separate parts of the case: (1) the time expended researching at the Worcester Registry of Deeds in November 2003; (2) work completed in opposition to the Emergency Motions of Moorshead in April 2004; (3) work completed in opposition to Moorshead’s subsequent Motions to Intervene and Stay the Receiver in July and August 2004; (4) online research at the Registry of Deeds and an affidavit of John L. Hause.[38]
*214 First, Arnowitz stated that as a result of the Suffolk case, he and Zimmerman became aware that Xarras had put mortgages on certain real estate that Arnowitz claimed were being used to hide funds from the creditors of HML. Arnowitz claimed that as a direct result of his firm’s research of the Charles Park Realty Trust at the Registry of Deeds, and a visit to the Fitchburg Property, Zimmerman was able to secure rents for the HML mortgage that had been assigned to him for the benefit of HML’s creditors. In so doing, A&G Attorney John Hause billed $1,375.00 for his research at the Worcester North Registry of Deeds and a visit to the Fitchburg Property in November 2003.
Second, Arnowitz states that just prior to the tenants sending payments to Zimmerman, Moorshead claimed that she was the Trustee of the Fitchburg Property and tried to intervene in the case. Arnowitz alleged that Moorshead advised the tenants that they should pay the rents to the Trustee and not to Zimmerman. Because this happened just before Zimmerman was alleged to be going on vacation, he (Zimmerman) was unable to attend Moorshead’s Emergency Motions hearing on Friday April 5,2004.[39] Arnowitz states that he thus had to spend considerable time in opposing these motions that were subsequently defeated. Arnowitz states that “when it became apparent that A&G would have to appear in court on Moorshead’s Emergency Motions, A&G began to treat that aspect of the case as billable to the receivership estate, as it was acting in the interest of all the creditors.” As a result Arnowitz billed a further $7,072.50 in preparing for and attending the hearing regarding Nickless’ Emergency Motion to Intervene in April 2004.
In July 2004, Arnowitz billed a further $5,500.00 to oppose Moorshead’s opposition to his Motion for Payment of Administrative Fees and for Monthly Interim Payments. In August 2004, Arnowitz billed a further $5,500 in Opposition to the Renewed Motion of Nicole Moorshead to Intervene and Revoke.[40] Finally in August 2004, Arnowitz billed $787.50 for online research at the Registry of Deeds and for drafting the affidavit of John Hause.
Zimmerman’s Second Interim Expense Report
On December 29, 2004, five years after his appointment as receiver, Zimmerman filed his Second Interim Report and Request for Payment of Fees and Expenses pursuant to Rule 9(a). Zimmerman reported his activities between September 1, 2004 and December 13, 2004. During this time period he claimed fees and expenses of $13,318.68 for forty-two hours work, and stated that after paying fees and expenses he had a total of $44,597.26 in his possession. Zimmerman provided an accounting of his income and disbursements. This accounting shows that between April 12, 2004 and December 9, 2004, Zimmerman collected $133,691.16 in receipts and had disbursements of $89,093.90. The disbursements consist of Zimmerman and Arnowitz’s fees, taxes, insurance, and two payments to Capitol. There does not appear to have been any disbursements to the creditors up to this point.
Zimmerman noted that he had received two proofs of claims, one from Beacon in the amount of $1,082.24, and a second, from the Department of Revenue of the Commonwealth of Massachusetts in the amount of $2,215.69. He requested permission from the court to pay these two proofs of claims. In addition, Zimmerman stated that he had received proofs of claims from two unsecured creditors: one from Suffolk in the amount of $1,049,439.30, and another from Hilti in the amount of $47,461.62.[41] As such, Zimmerman requested permission from the court to make monthly pro rata payments to the unsecured creditors after taking fees and expenses of the receivership estate and the cost of operating the Fitchburg Property into account. The amount to be paid to Suffolk and Hilti would be at Zimmerman’s “sole discretion.” After a hearing, and no opposition having been filed, Zimmerman’s Second Interim Report was allowed on January 19, 2005 (MacDonald, J.).
It should be noted that Hilti was a judgment creditor of HML and therefore the receivership clearly fell under the umbrella of an appointment of a statutory receiver under G.L.c. 156(b), §105.
However, it is now very clear that Suffolk is not and was never a judgment creditor. Suffolk had an original unliquidated claim of approximately $122,000 against HML. However, Arnowitz reported to Zimmerman as receiver that Suffolk was owed $1,020,584.32 with a per diem interest of $335.53 or $122,470.10 per annum by HML. Zimmerman and Arnowitz both misled the court by not being frank and disclosing that the debt was unliquidated, in litigation and ultimately determined to be an amount of $122,000 by the trial justice instead $1,020,584.32. They, Arnowitz and Zimmerman, thus integrated an equity receivership, an unliquidated debt, under the umbrella of a statutory receivership without disclosing the difference to the court. It would seem to be much more proper and candid with the court to either (1) file a separate equitable proceeding with Suffolk as an unliquidated debtor and then move to consolidate; or (2) file an amended complaint in the original action so as to include Suffolk under the umbrella of a separate equitable creditor, as opposed to a statutory creditor, receivership. This does not include the thought of the court in regard to Arnowitz who this court construes as having a substantial conflict of interest because he represents both creditors Hilti and Suffolk who have very different competing interests, one as an established judgment creditor; and Suffolk as an unliqui-dated contract creditor involved in litigation.
Zimmerman’s Third Interim Report
Zimmerman’s Third Interim Report and Request for Payment of Fees and Expenses pursuant to Rule 9(a) *215 was filed on May 19, 2005. This report covered the period December 14, 2004 through May 5, 2005. The report indicated that he had moved ahead with foreclosure proceedings on the Westminster Property (six years after his appointment as receiver). In so doing Zimmerman had filed a request at the Land Court Case to remove a cloud on the title on the Westminster Property; he also filed and received a lis pendens on same. Zimmerman stated that he had $35,029.68 in his possession after payment of authorized expenses and attached an accounting. Between December 14, 2004 and May 5, 2005, Zimmerman claimed to have incurred expenses of $27,477.12 after a total of 98 hours work. His accounting shows that between April 12, 2004 and April 28, 2005, Zimmerman had collected $196,679.88 and made disbursements of $161,650.20.
The attached accounting indicated that two payments were made from the HML’s receivership estate account to “Arnowitz & Goldberg/Hilti, Inc./Suffolk”: one payment in the amount of $15,000.00 on February 2, 2005, and another payment in the amount of $10,000 on March 29, 2005. Thus, as of April 28, 2005, on its face, it appears that Zimmerman has paid approximately 12.71% of the total receivership receipts to the creditors, Hilti and Suffolk,[42] care of Arnowitz. Zimmerman sought approval of the report and his fees and expenses. Zimmerman’s Third Interim Report and Request for Payment of Fees and Expenses was allowed on May 31, 2005, with no opposition having been filed (Connor, J.).
Trustee Curry’s and Beneficiary Moorshead’s Third Attempt to Intervene
On June 6, 2005, Alexis Curry (“Curry”), as Trustee of the Fitchburg Property, and Moorshead, as sole beneficiary of the Fitchburg Property, moved for leave to file a complaint for declaratory judgment against Zimmerman. Curry and Moorshead disputed whether there was in fact any debt owed on the mortgage that Zimmerman had collected rents on as part of his receivership duties. The motion was opposed by Zimmerman. Arnowitz also filed an opposition and a cross motion to Strike the Motion to File a Complaint for Declaratory Judgment Against Receiver.[43] On June 22, 2005, in denying Curry’s and Moorshead’s motion this court noted in a margin entry that,
This motion has been brought and denied twice without appeal or request for reconsideration. The moving party has also failed to comply with Superior Court Rule 9(a) requirement of filing pleadings within 10 days. Parties will have opportunities to assert their defenses when a foreclosure is commenced.
Arnowitz’s opposition and cross motion were allowed on the same day. On June 6, 2005, he also filed a Cross Motion for Sanctions that Curry and Moorhead opposed. In this motion, Arnowitz asked for sanctions against Moorshead and Curry as a result of their various motions to intervene and attempts to file suit against Zimmerman. Specifically Arnowitz asked that: 1) Curry and Moorshead be enjoined from filing any further legal proceedings that might interfere with Zimmerman’s duties; 2) that Curry and Moorshead be assessed $80,000 in legal fees to repay the estate of HML; 3) and that Zimmerman be appointed as Receiver of the Fitchburg Property since the Trust could no longer pay its debts as they came due.
On June 30, 2006, Arnowitz’s motion was allowed in part, assessing legal fees in the amount of $3,650 to Zimmerman and Arnowitz for defending Curry’s and Moorshead’s declaratory judgment motion (Connor, J.). Curry and Moorshead filed a notice of appeal of this order denying their motion to file, and granting in part, Arnowitz’s motion for sanctions.
Receiver’s Fourth Interim Report and Request for Expenses
On November 22, 2005, Zimmerman filed his Fourth Interim Report and Request for Expenses pursuant to Rule 9(a). This report covered the period May 12, 2005 through November 3, 2005. Zimmerman stated that he had $23,000.99 in his possession. After 41.5 hours work on the receivership estate, he claimed fees and expenses of $11,848.21 between May 12, 2005 and November 3, 2005. The accounting provided by Zimmerman shows that an additional three payments were made to “Arnowitz & Goldberg, Attys/Hilti/Suffolk.”: 1) $12,000.000 on June 23, 2005; 2) $10,000 on August 11, 2005; and 3) $10,000 on October 11, 2005. As of November 1, 2005 Zimmerman’s accounts show that he has collected $290,437.85 in receipts and paid out $267,436.86 in disbursements. Zimmerman had paid out a total of $57,000 to “Arnowitz & Goldberg, Attys/Hilti/Suf-folk”, which accounted for only 21.31% of total monies collected up to this point. None of these reports suggest to the court how much was distributed to Hilti and how much to Suffolk. This report was allowed on December 16, 2005 (Agnes, J.).
Receiver’s Fifth Interim Report and Request for Expenses
On June 8, 2006, Zimmerman filed his Fifth Interim Report and Request for Expenses pursuant to Rule 9(a). This report covered the period November 4, 2005 through May 19, 2006. He stated that he had $30,856.10 in his possession. After 82 hours work on the receivership estate, Zimmerman claimed fees and expenses of $22,813.80 for the period. The accounting further shows that an additional two payments were made to Hilti and Suffolk: 1) $10,000.00 on December 22, 2005; and 2) $12,000 on March 28, 2006. Again these entries were marked as disbursements to “Arnowitz & Goldberg, Attys/Hilti/Suffolk.” This report has yet to be approved by this court.
*216 Xarras’s Motion to Replace the Receiver
On April 20, 2006, Xarras filed a Motion to Intervene[44] and a Motion to Replace the Receiver. Both Zimmerman and Arnowitz filed motions in opposition.[45] In his Motion to Replace the Receiver Xarras alleges that Zimmerman had “engaged in a consistent and continuous pattern of breaching the fiduciary duty he owes HML and the court.” Specifically, Xarras alleges that Arnowitz and Zimmerman have a “close relationship,” that Zimmerman has demonstrated self-dealing, favoring entities related to him, and favoring the law firm that requested his appointment.
Xarras claims that Zimmerman breached the fiduciary duty he owes to HML in three ways. First, Xarras states that Zimmerman and Arnowitz have conspired to use monies collected for the receivership estate of HML to pay themselves excessive fees. Xarras alleges that from September 13, 2005 through November 2005 Zimmerman paid himself $94,106.75 from the funds he collected on behalf of HML. Xarras also alleges that from September 13, 2004, through November 2005, Zimmerman paid A&G $77,250.50 from receivership funds he had collected. Xarras further alleges that monies paid to Zimmerman and A&G account for approximately 60% of the total monies collected.
Second, Xarras alleges that “very little, if any monies,” have been paid to the creditors of HML. At the hearing on September 19, 2006, Xarras alleged that “not one nickel has gone to a creditor.”[46] Xarras states in an attached affidavit to his motion that he does not believe that any of the monies Zimmerman collected have been paid to the creditors because he continues “to receive documents from the various relevant courts that indicate that both Hilti and Suffolk are still owed the same amount from HML, with interest accumulating daily.”
Third, Xarras contends that from September 13, 2004 through November 2005, Zimmerman paid $15,224.06 to Capitol for management services of the Fitchburg Properly. Xarras alleges that Capitol’s property manager is the husband of an attorney in Zimmerman’s office, and that as the properties are located in Worcester County it would be “more practical and cost effective to appoint a Receiver who is more locally situated.” Finally, Xarras contends that Zimmerman, as receiver, filed an affidavit in the Suffolk case whereby he advocated that the court assess treble damages against HML, thus breaching the fiduciary duty that Zimmerman owes to HML.
Arnowitz’s and Zimmerman’s Position
In his opposition, Zimmerman stated that he made great efforts to collect money on behalf of the HML estate and had collected over $355,000 by April 1, 2006. In so doing Zimmerman states that he has filed four Interim Reports and Request for Expenses with the court, all of which have been approved. Zimmerman states that despite serving these reports on Dombrowski, Xarras’s counsel of record, Dombrowski never filed an opposition to the request for fees. Zimmerman contends that much of the time expended was in opposing litigation that has been initiated by “Xarras, his wife, his two sisters and various entities controlled by Xarras, including evicting Xarras’s sister from a store in on the Fitchburg Property.”
With regard to Capitol’s employment to manage the Fitchburg Property, Zimmerman further states that the job was not a “plum assignment.” Indeed, Capitol was not his first choice; rather other property managers refused to accept the assignment because of the “turmoil” at the property. The “others” were never identified. Zimmerman also avers that Capitol has provided services for their monthly fee, and that Xarras has not challenged the quality or timeliness of the services. With regard to his affidavit, Zimmerman states that an affidavit, signed under penalties of perjury, is not a per se breach of fiduciary duty.
Arnowitz contends that Xarras’s motion is “untimely and frivolous” because Xarras has been involved in the proceedings for the past seven years and Dombrowski, as Xarras’s attorney, had been given notice of all pleadings since he entered his appearance on the matter but has taken no action on the matter. Arnowitz contends that the creditors, Suffolk and Hilti, have in fact received funds from the HML receivership estate, without revealing to the court how much or what percentage, despite the large amount of legal fees generated in thwarting the “frivolous” litigation initiated by Xarras. Arnowitz states that the monies paid to Suffolk and Hilti from the HML estate were split on a pro rata distribution of 95% and 5% respectively. As such, Arnowitz claims that as of the date of the motion, April 20, 2006, the creditors had been paid a total of $69,000 through Zimmerman, with Suffolk receiving $65,550 and Hilti receiving $3,450.
The May 15, 2006 Hearing before Judge Murphy
On May 15, 2006, a hearing was held before Judge Murphy. Four motions were addressed at this hearing: 1) Xarras’s Motion to Intervene; 2) Xarras’s Motion to Replace the Receiver; 3) Receiver’s Opposition to Xarras’s Motion to Intervene and Motion to Replace the Receiver; 4) Hilti’s Opposition to Xarras’s Motion to Intervene and Motion to Replace the Receiver and Cross Motion for Costs. The docket reflects that the court allowed Xarras’s Motion to Intervene[47] on May 15, 2006 and sua sponte, entered a margin entry on that motion stating as follows:
It is ordered that the fees of Atty. Arnowitz for representation of Hilti & Suffolk Construction are to be held in an interest bearing account w/ Attys. Arnowitz and Dombrowski as co-escrowers. The fees of Atty Zimmerman, as Receiver, shall henceforth likewise, be deposited in the same account. Without Prejudice, and until further order of the Court. (Murphy, J.)
The docket does not reflect the issuing of any other orders as a result of the May 15, 2006 hearing.[48]
*217 Zimmerman’s Motion to Reconsider Escrow of His Fees
On June 7, 2006, Zimmerman filed a Motion for Reconsideration of Judge Murphy’s sua sponte escrow order. Zimmerman stated that all fees he had received were for previously provided rather than prospective services, and that he did not file fee requests on a regular basis, but only when “substantial fees [had] been incurred, there [were] funds available to pay the fees and in conjunction with a report to the Court of the status of the proceedings.” Furthermore, Zimmerman stated that he had two proceedings in Land Court that could create additional funds for HML’s creditors that would incur substantial expenses. Zimmerman alleged that the escrow of his fees in this case would not allow him to pay the necessary costs of operation of his law office. He further noted that he had the court’s authority to make periodic payments to creditors of the receivership estate, and that any fees due to Amowitz were a matter of contract between Arnowitz and Hilti, and therefore were “not subject to this Court’s supervision.” As such, Zimmerman requested that the sua sponte order be vacated, or that a hearing be conducted on the reconsideration of the escrow order, either by Judge Murphy or the Regional Administrative Justice, Judge McCann.
Xarras’s Opposition to Zimmerman’s Motion to Reconsider
On June 15, 2006, Xarras filed an opposition to Zimmerman’s Motion for Reconsideration. Xarras contends that no new information was submitted to the court in Zimmerman’s Motion for Reconsideration, and that Zimmerman had failed to explain why “significant monies” were paid to him and Amowitz, without any monies being paid to creditors.
In addition, Xarras states that Zimmerman has failed to adequately explain why he advocated against HML in the Suffolk case, or why it would not be more practical and cost effective to appoint a local Receiver.
Amowitz’s Motion to Reconsider Escrow of His Fees
On June 27, 2006, Amowitz also filed a Motion for Reconsideration. Amowitz suggested that the placing of his fees for the representation of Hilti and Suffolk in an escrow account prejudices his client in this matter. Amowitz further stated that the escrow of his fees in this matter violates the Contracts Clause of the United States Constitution, and that the court does not have the authority, either by statute or case law, to escrow his fees. Amowitz requested that the order be vacated.
The September 19, 2006 Hearing
On June 27, 2006, Judge Murphy took no action and referred all pending motions to the Regional Administrative, McCann, J., for a hearing. That hearing took place on September 19, 2006 (“the Hearing”). Attorneys Zimmerman, Amowitz, Dombrowski and Nickels[49] appeared before the court at the Hearing. Judge McCann heard arguments on four motions: 1) Xarras’s Motion to Replace the Receiver; 2) Zimmerman’s Motions for Reconsideration of the Escrow of His Fees; 3) Arnowitz’s Motion for Reconsideration of the Escrow of his Fees and Cross Motion for Costs; and 4) Motion of Alexis Curry to File a Counterclaim in Land Court.[50] The motions were taken under advisement, and Judge Murphy’s Escrow Order was left in full effect.
DISCUSSION
Xarras’s Answer on Behalf of HML
As a preliminary matter it is apparent that Xarras’s pro se answer to Hilti’s complaint to appoint a Receiver should not have been accepted by the Clerk’s Office, or at least stricken from the record by motion of Hilti, which was never filed. A defendant corporation may not be represented injudicial proceedings by a corporate officer who is not licensed to practice law. HML Development Corp. should then have been defaulted. It never was. It is well settled law in Massachusetts that “corporations must appear and be represented in court, if at all, by attorneys.” Driscoll v. T.R. White Company, Inc., 441 Mass. 1009, 1010 (2004) (quoting Varney Enters, Inc. v. WMF, Inc., 402 Mass. 79, 82 (1988); see also, G.L.A. 221, §46. Individuals that accept the benefits of incorporation must “bear the burden of hiring counsel to sue or defend in court.” Id. (citing Walacavage v. Excell 2000, Inc., 331 Pa.Super. 137, 142-43 (1984)). A defendant who fails to file an answer is subject to entry of default and a judgment of default. See Mass.R.Civ.P. 55(a), 55(b).
It appears that Xarras, President of HML, filed an answer to Hilti’s complaint to appoint a Receiver. This complaint was filed against a corporation and James L. Xarras was not named as a defendant at that time. Xarras could not properly answer a complaint on behalf of the corporation unless he was a licensed attorney in Massachusetts. Thus HML was required to hire an attorney to represent it in this case, including the filing of an answer. This did not occur. HML’s answer to the complaint should have been stricken and a default judgment properly entered thereon. Amowitz took no such remedial action.
The Duty of a Statutory Receiver
A receivership is a prophylactic measure to protect assets in the event a particular creditor can prove that corporation is liable on a debt. See Charlette v. Charlette Bros. Foundry, Inc., 59 Mass.App.Ct. 34, (2003), quoting Shapiro, Perlin, & Connors, Collection Law §13.1 (3d ed. 2000); see New England Theatres, Inc. v. Olympia Theatres, Inc., 287 Mass. 485, 492, 192 N.E. 93 (1934), cert. denied sub nom. E.M. Loew’s, Inc. v. New England Theatres, Inc., 294 U.S. 713, 55 S.Ct. 509, 79 L.Ed. 1247 (1935); Lopez v. Medford Community Center, Inc., 384 Mass. 163, 169 (1981); Jae Corp. v. Massachusetts Port Realty Co., 3 Mass.App.Ct. 704, 704 (1975).
The appointment of a Receiver for a domestic corporation rests within the sound discretion of the court, and should be exercised where it appears that the corporate *218 property would be subject to waste or loss In the absence of a Receiver thereby impairing the ability of the corporation to pay its debts. New England Theatres, Inc. v. Olympia Theatres, Inc., 287 Mass. 485, 492 (1934). A statutory Receiver may be appointed and dismissed only by order of the court. See Mass.R.Civ.P. 66(a), Superior Court Rule 51. A statutory Receiver may be appointed under G.L.c. 156(b), §105,
If a judgment has been recovered against a corporation and it has neglected for thirty days after demand made on execution to pay the amount due with the officer’s fees, or to exhibit to the officer real or personal property belonging to it and subject to be taken on execution sufficient to satisfy the same and the execution has been returned unsatisfied, one or more Receivers may be appointed with the powers and duties provided in, and subject to, section one hundred and four.
See also, Pouliot v. West India Fruit Co., 283 Mass. 182, 184 (1933); George Altman, Inc. v. Vogue Internationale, Inc., 366 Mass. 176, 178-79 (1974). For the court to grant the request of a creditor for the appointment of a statutory Receiver, there must be a valid unpaid judgment against the corporation. See George Altman, Inc. v. Vogue Internationale, Inc., 366 Mass. 176, 180 (1974). A creditor does not qualify as a “judgment creditor” until the judgment enters. Smola v. Camara, 16 Mass.App.Ct. 908, 909 (1983).
The objective of the Receiver should be that of estate maximization. Fleet Nat. Bank at 96 F.3d at 540. The objective of estate maximization is also secured in part by the “safeguard of court oversight” of any actions taken by a Receiver. Id. Under the statute the Receiver has a duiy to pay all debts due from the corporation if the funds in their hands are sufficient, and if they are not, to distribute the funds ratably among the court-approved creditors.[51] See G.L.c. 156(b), §106. “If there is abalance remaining after the payment of the debts, the Receivers shall distribute and pay it to those who are justly entitled thereto as having been stockholders of the corporation, or their legal representatives.” Id. Ordinarily, the sale of assets should be upon such terms and conditions as will, within a reasonable time, convert the assets to cash and bring about a distribution of such assets to creditors and stockholders. Boucher v. Hamilton Mfg. Co., 259 Mass. 259, 268-69 (1927) (the terms of any sale by Receivers must be such as to convert the property within a reasonable time into cash, so that distribution can be made to those in interest). It is the duty of the Receiver to determine the validify and the preference to be accorded to the claims of creditors. Old Colony Trust Co. v. Puritan Motors Corporation, 244 Mass. 259, 261 (1923). It is of paramount importance that during this process the Receiver ensures that the creditors receive equality of treatment so far as is permissible under the law. New England Theaters v. Olympia Theatres, 287 Mass. 485, 494 (1934).
Within thirty days of appointment, the Receiver must provide the court with a detailed inventory of possessed property, or property as to which the Receiver has a right to possession. See Mass.R.Civ.P. 66(b) and Sup.Ct. Rule 51. This list must include a list of encumbrances on said property, along with estimated values. Mass.R.Civ.P. 66(b). If this cannot be accomplished within thirty days, the Receiver may seek an extension of time from the court. The Receiver must also provide to the court a list of all known creditors, along with a list of those whose property is being held by the Receiver. Id. The Receiver must file, not later than the fifteenth day of February of each year, a detailed account under oath, together with a report of the “condition of the receivership.” See Mass.R.Civ.P. 66(c). Further accounts and reports may be ordered by the court, although the court may relieve the Receiver of this requirement. See Mass.R.Civ.P. (b) and (f). Once a Receiver distributes all of the assets of the corporation, the Receiver files the final account of the assets with the court and the court then discharges the Receiver. See Mass.R.Civ.P. 66(e) and Sup.Ct. Rule 51. Both Mass.R.Civ.P. 66(d) and Superior Court Rule 51 limit the ability of a Receiver who is an attorney from employing an attorney without order of the court.
The Fiduciary Duty of a Receiver
No Massachusetts state court has addressed the fiduciary duty of a Receiver. The dearth of case law, statutory provisions, or treatises have made the analysis of these motions difficult. This court has drawn what it can from Massachusetts as well as other jurisdictions. Nevertheless there is no doubt that a court-appointed Receiver is a “full-fledged fiduciary.” Fleet Nat. Bank v. H&D Entertainment, Inc., 96 F.3d 532, 540 (1st. Cir. 1996). A Receiver does not act solely as the agent of the company for which they have been appointed Receiver. Rochester Tumbler Works v. Mitchell Woodbury Co., 215 Mass. 194, 198 (1913). A Receiver is a representative of the court and of all parties with an interest in the litigation. Wellman v. North, 256 Mass. 496, 501 (1926). Thus, a Receiver owes fiduciary duly to all the parties in interest, including the creditors and the shareholder(s), and is “under the duty to act impartially toward, and protect the rights of, all parties.” 16 Fletcher Cyc. Corp. §7813. See also, Phelan v. Middle States Oil Corp., 154 F.2d 978, 991 (2d Cir. 1946) (Receiver owes a duty of strict impartiality and undivided loyalty to all parties interested in the receivership estate, and must not dilute that loyally).
Due to the fiduciary nature of his duty to the parties, a Receiver is not permitted to deal with the trust estate for his own benefit and advantage. See id.; Sanders v. Stevens, 51 F.2d 743, 744 (D.Miss. S.D. 1931); In re Singer Furniture Corp., 47 F.2d 780, 784 (D.C. S.D.N.Y. 1931); In re Insull Utility Investments, 6 F.Sup 653, 660 (D.C. Ill. 1933). As a fiduciary, a Receiver must avoid all conflicts of interest, and cannot derive personal profit from the appointment, other than reasonable compensation. See, Magruder v. *219 Drury, 235 U.S. 106, 119-20 (1914) (trustee cannot make personal profit from managed estate); Phelan v. Middle States Oil Corp., 154 F.2d 978, 991 (2d Cir. 1946) (Receiver must act openly and fairly, and must not use position for their own profit or to further the interests of themselves or any associates); Lowder v. All Star Mills, Inc., 309 N.C. 695, 701-02 (1983) (no one should be appointed Receiver whose personal interests would substantially conflict with his or her unbiased judgment and duties as a Receiver). Under certain circumstances a Receiver may be held personally liable by the court for failure to properly perform his duties as Receiver. American Bridge Products, Inc. v. Decoulous, 328 B.R. 274 (Bkrtcy. D.Mass. 2005).
The compensation to be paid to a Receiver is not regulated by a fixed commission of the money that passes through his hands, but rather, what would be a reasonable fee for the services required and rendered by a person of ordinary ability and competent for such duties and services. Jones n Keen, 115 Mass. 170, 181 (1871); Grant v. Bryant, 101 Mass. 567, 570 (1869). What is a reasonable fee is a question that is to be determined by the sound discretion of the judge. Berman v. Linnane, 434 Mass. 302-03 (2001) (citing McGrath v. Mishara, 386 Mass. 74, 87 (1982)).
In determining whether the fee paid to a Receiver as compensation for work done is reasonable a number of factors must be taken into consideration, including, “the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases.” Berman, 434 Mass. at 303, (quoting Linthicum v. Archambault, 379 Mass. 381, 388-89 (1979)). No single factor is determinative, and a “factor-by-factor analysis, although helpful, is not required.” Id. (citing Margolies v. Hopkins, 401 Mass. 88, 93 (1987)). In proving the amount of attorneys fees, contemporaneous time records, although not absolutely essential where there is other reliable evidence to support the claim, are very important. Handy v. Penal Institutions Commissioner of Boston, 412 Mass. 759, 592 (1992).
Zimmerman and Amowitz’s Relationship
HML alleges in his Motion to Replace the Receiver that Arnowitz’s “close relationship” with Zimmerman is central to this case, and that Zimmerman and Amowitz’s actions must be viewed in light of that alleged relationship. It is undisputed that Arnowitz asked this court to appoint Zimmerman as Receiver in this case, that they have a professional relationship going back twenty years, and that during this time Arnowitz used Zimmerman as a Receiver in other matters. Arnowitz and Zimmerman worked together during the Suffolk case in which Zimmerman actually intervened, and Zimmerman submitted an affidavit in support of Amowitz’s claim for an assessment of treble damages. Similarly, the record reflects that Zimmerman and Arnowitz have worked together in tracking down the assets of HML, and that Arnowitz even appeared for Zimmerman as Receiver in this case when he (Zimmerman) was on vacation in April 2004. Zimmerman also submitted a fees and expenses request for Arnowitz. The record reflects, and this court has no doubt, that Arnowitz and Zimmerman have a close and longstanding professional relationship that has influenced their actions in this case.
Zimmerman’s Fiduciary Duty
Zimmerman owes a fiduciary duty to this court, HML, Hilti, Suffolk and all other creditors to maximize HML’s estate, as well as the stockholders, or former stockholders of HML and to avoid waste or loss that might occur if a Receiver was not appointed. Xarras makes four main allegations against Zimmerman for breach of fiduciary duty; (1) that Zimmerman has abused his position as Receiver, and due to his “close relationship” with Arnowitz has enriched himself and Arnowitz by running up large legal fees which have been paid out of the estate of HML; (2) that little if any monies have been paid to the creditors of HML; (3) that Zimmerman abused his position as Receiver by hiring Capitol to manage the Fitchburg Property, and paying them $15,224.06 from HML funds, when Capitol is owned and operated by an associate of Zimmerman’s, rather than hiring a local and cheaper property manager; and (4) that Zimmerman breached his fiduciary duty to HML by filing an affidavit against HML in the Suffolk case. It should be stressed that in making a determination as to whether the Receiver should be removed, this court does not view each incident of alleged impropriety in isolation, but rather as a whole.
Zimmerman’s Delay: Milking the Receivership
Zimmerman appears to have used his position as Receiver as a vehicle for generating fees for himself and his associates, rather than as means to promptly, fairly and adequately compensate HML’s judgment creditors. Upon his appointment as Receiver in March 1999, Zimmerman was required by statute to promptly liquidate HML’s assets and make appropriate distributions to creditors within a reasonable time on the judgment involving Hilti. In regard to Suffolk, his duties were equitable in nature and required a different reporting procedure to the court. See G.L.c. 156(b), §106. This courtis of the opinion that Zimmerman failed to carry out his statutory and equitable duties. Moreover, the March 19,1999 order appointing Zimmerman as Receiver required him to file with the court within 30 days of the issue of the order: 1) a detailed inventory of the property within his possession or that he had a right to possess; 2) the value of that property; 3) a list of encumbrances on the property; and 4) a list of known creditors of the receivership.[52] See, MassR.Civ.P. 66(b) and Sup.Ct. Rule 51. There is no evidence in the record that Zimmerman complied with this part of the order.
*220 In 1999 Zimmerman became aware that HML was the mortgagee on two properties, the Westminster and Fitch-burg Properties respectively, with a combined value of $1,559,071.00. It is difficult to see why Zimmerman would not have moved expeditiously to foreclose on the Fitchburg and Westminster Properties in 1999, as he was required to do as Receiver. In September 1999, six months after Zimmerman’s appointment, HML owed $160,493.83. In November 1999 HML owed Hilti $32,789.00. With the total amount owed by HML being less than $200,000 at the end of 1999, it is entirely conceivable that Zimmerman could have foreclosed on the properties and easily have satisfied the full judgment amounts owed to Hilti and Suffolk.
However, rather than ask this court to foreclose the mortgages on the two properties, Zimmerman merely filed a motion to receive mortgage payments that were due to HML, and to have the mortgages assigned to HML.[53] Thus Zimmerman did not act in the best interests of HML, and did not fulfill his duty to liquidate the assets of the HML and make prompt payments to the creditors of HML. Indeed, Zimmerman did not begin to foreclose on the Westminster Properly until 2004, and does not appear to have begun the foreclosure on the Fitchburg Property at all. It is apparent that Zimmerman has delayed the process in an effort to maximize his own and his associates’ fees from the HML estate. Zimmerman’s failure to carry out the basic duly of a statutory Receiver weighs very heavily against his removal as Receiver in this case.
Money Paid to Creditors by Zimmerman
Xarras claims that little or no money has been paid to HML’s creditors from the receivership estate. A review of the Interim Reports provided show that as of May 16, 2006, Zimmerman had paid out a total of $79,000.00 to Arnowitz as attorney for Suffolk and Hilti, which accounted for 20.1% of total monies collected by Zimmerman for the HML estate. At the Hearing Zimmerman stated that approximately $70-80,000 had been paid to Hilti and Suffolk.[54] When asked what proportion had been paid to Hilti and Suffolk respectively Zimmerman stated that he did not .know because he had simply made the check payable to Arnowitz who would then pro-rate it between the two creditors, with Suffolk presumably receiving 97% and Hilti receiving 3%.[55] This is consistent with Zimmerman’s reports that show seven payments to: “Arnowitz & Goldberg, Attys/Hilti/Suffolk.”
Presumably, Xarras read these entries as payments to Arnowitz alone rather than payments to Hilti and Suffolk, c/o Arnowitz. Hence it would appear Xarras believes that the accounts Zimmerman provided reflect no payments to Hilti or Suffolk. Nevertheless, Xarras alleges in his affidavit, and Dombrowski alleged in the Hearing, that Hilti and Suffolk had in fact not been credited any payments and that interest had continued to be charged on the principal amounts.
With this concern in mind, a further step is needed. It does not appear that Zimmerman has offered any documentation to prove that the monies that he paid to Amowitz’s firm on behalf of Hilti and Suffolk from the HML estate have actually reached these creditors. Zimmerman should have provided further documentation to this court, demonstrating that the disbursements made to Arnowitz on behalf of Suffolk and Hilti, have actually been paid to the respective creditors’ accounts, and not to an attorney who is not a creditor. Zimmerman’s duty is not to Arnowitz but to Hilti and Suffolk directly.
Zimmerman’s Fees
The fees paid to Zimmerman from the receivership estate, while not by themselves excessive, must be viewed in light of the fact that they were earned during a receivership which this court finds to be excessively long. Zimmerman is an experienced Receiver who has engaged in this type of work for over thirty years.[56] A review of the record indicates that Zimmerman charged $300.00 an hour for his services. Xarras does not allege that Zimmerman charged an excessive hourly rate, and Zimmerman’s hourly rate of $300 was found to be reasonable by this court when it approved Zimmerman’s motion for costs against Alexis Curiy.
A review of Zimmerman’s Fifth Interim Report, which is pending before this court, reveals that between April 12, 2004 and May 16, 2006, Zimmerman collected receipts of $392,924.41 on behalf of the HML estate, mostly by collecting rents from tenants at the Fitchburg Property. The accounting also shows that Zimmerman made disbursements of $362,068.31 within the same time period. Zimmerman was paid a total of $ 116,718.25 in court-approved fees and expenses for his law firm from the receivership estate of HML. Thus, as of May 16,2006, Zimmerman’s fees account for 29.7% of all monies he collected for the HML estate.
Zimmerman has submitted five separate Interim Reports and Requests for Payment of Fees and Expenses, four of which were approved by this court, and one of which is pending. In each report Zimmerman has documented the work that was carried out on the receivership estate, has attached detailed accountings of the receipts and disbursements of the receivership estate, and has completed detailed time sheets for his fees and expenses. During his time as Receiver Zimmerman has: 1) received an assignment of a mortgage from HML on the Fitchburg Property which has provided substantial funds for the HML estate in excess of $355,000; 2) has taken steps to clear title on the Fitchburg Property by filing an action in land court; 3) forced an assignment of the mortgage held by HML on the Westminster Property, and filed a complaint to foreclose said mortgage in land court; and 4) has defended three motions to intervene on behalf of Nicole Moorshead and Alexis Curry respectively.
Xarras states that between September 13,2004 and November 2005 Zimmerman paid himself $94,106.75.[57] A review of Zimmerman’s accounts *221 shows thathe actually paid himself $82,258.54 during this period. In any event, Xarras’s statement is misleading. The payments that Xarras refers to, although made between September 2004 and November 2005, were actually authorized for work performed between March 24, 1999 and May 2005. Indeed, the approved First Interim Report for Payment of Fees and Expenses which requested $41,462.74 in fees covered a period of over 5 1/2 years, from March 1999 through August 2004. Thus, Zimmerman did not request fees for the first 5 1/2 years of the receivership.
Zimmerman made further requests for payment of fees in subsequent Interim Reports. However, these subsequent requests must be viewed in light of the fact that April 2004 saw the advent of repeated attempts by Moorshead and Curiy to intervene in the case and prevent Zimmerman from collecting rents on the Fitch-burg Properly. All of these attempts were repeatedly denied by the court. This obviously required extensive litigation and Zimmerman had a fiduciary duty to thwart Moorshead and Curry in their attempts to prevent HML from recovering assets. However, as previously noted, it is not clear to this court why the receivership found itself in this position in 2004, when Zimmerman could have promptly foreclosed on the Fitchburg and Westminster properties, as assets of HML, after his appointment as Receiver in March 1999.
Zimmerman’s Employment of Others
Zimmerman’s employment of attorneys in his office, without prior approval of this court, for which he billed the receivership estate, adds weight to a finding that he should be removed as Receiver. It appears from the time sheets submitted with the Receiver’s Interim Reports that Zimmerman has employed various attorneys and paralegals in his office to carry out work on the HML receivership estate, and as such, the various interim reports that have been submitted have requested that these fees be paid out of the receivership estate. When a Receiver requires another attorney to help him work on a receivership case, he is required to petition the court, “stating the name of the attorney whom he desires to employ and showing the necessity of such employment.” See Mass.R.Civ.P. 66(e) and Sup.Ct. Rule 51.
In an order dated November 9, 2006, this court noted that his Fifth Interim Report listed four individuals in his expenses time sheet: LBD, PLZ, JR. and RLB. Zimmerman was ordered to report back to the court their identity, relationship to the Receiver, and normal hourly rate (McCann, J.). On November 28, 2006, Zimmerman identified the following: (1) LBD is Lisa Darman, an attorney and partner at S&K, with an hourly rate of $250.00, whose “primary responsibility ... is to be the lead attorney in the two Land Court Cases filed by the Receiver; (2) PLZ is Peter Zimmerman, who charges an hourly rate of $325.00; (3) JAR is Janine A. Rzasa is a paralegal and employee of S&K, with an hourly rate of $125.00; and (4) RLB is Richard L. Blumenthal, an attorney and partner at S&K, with an hourly rate of $295.00, whose primary responsibility is to prepare legal memoranda for the Receiver.[58] There is no evidence that Zimmerman ever petitioned this court for permission to authorize Lisa Darman, Richard Blumenthal or any other attorneys. Similar comments about payments to Arnowitz on the same issue had been previously addressed. Such a finding adds weight to a finding that Zimmerman should be removed as Receiver as he has failed to comply with his duty as a statutory Receiver.
The Appointment of Capitol to Manage the Fitchburg Properly
Zimmerman’s employment of the husband of a member of his firm to manage a property that should have been foreclosed on, liquidated and paid to creditors, lends weight to a finding that Zimmerman should be replaced as Receiver. Xarras alleges that Zimmerman also breached his fiduciary duty to HML by paying Capitol $15,224.06 to manage the Fitchburg Property in fees between September 13, 2004 and November 2005. Specifically Xarras alleges that Capitol was “owned and operated by an associate of Zimmerman’s,”[59] and was thus making decisions in his management of the receivership estate to favor “entities related to him”[60] rather than make decisions that would benefit the estate.
At the Hearing, Attorney Nickless stated that the manager of the Fitchburg Property was “Zimmerman’s partner or associate.”[61] Zimmerman indicated that the property manager was the husband of a member of his firm.[62] Zimmerman stated that he asked the court for permission to appoint a property manager, but that nobody in the Fitchburg area would do the job because he could not guarantee that they would be paid.[63] He did not disclose to the court who else had been asked. As such, Zimmerman asked the husband of one of his firm colleagues out of Boston to manage the property and he agreed.[64] Zimmerman stated that this was all disclosed to the court.[65] The property manager was paid at 8.5% of gross rents,[66] which Zimmerman claims is below the 10% industry standard rate of for managing property.[67]
A review of the accounting of HML’s accounts provided by Zimmerman indicate that between April 2004 and May 2006, Capitol was paid $23,617.43 from the HML receivership estate. Xarras has not disputed that Capitol carried out its duties satisfactorily or that the fee charged by Capitol is excessive. Instead he relies on the fact that the property manager is the husband of an associate in Zimmerman’s firm to raise an inference of a breach of fiduciary duty on the part of Zimmerman. The property manager Zimmerman employed was not a member of his law firm, and there is no evidence that fees or expenses were paid to Zimmerman or his firm in connection with the management of the Fitchburg Property. Zimmerman stated that Capitol would send him a bill and he would pay the funds out of the receivership estate. He had already received approval of the court to pay for the running expenses of the Fitchburg Property, and was *222 thus authorized to make this payment. The amount of payment does not appear to be excessive and is not challenged as such by Xarras.
Nevertheless, this court concludes that this is another example of Zimmerman using the Receivership estate as a vehicle for which to generate income for associates. In effect, Zimmerman’s failure to promptly foreclose on the Fitchburg Property enabled him to help the husband of a member of his law firm get their nose in the HML receivership trough. If a property manager was needed it is entirely reasonable for HML to wonder why Zimmerman did not make an effort to find a property manager in the north Worcester County area. There is no indication from Zimmerman as to which other property managers he contacted and how much they charged for their services. As such, Zimmerman’s hiring of the husband of an S&K attorney to manage the Fitchburg property adds weight to a finding that he should be replaced as Receiver.
The Payment of Fees to Arnowitz
The unquestioned request for authorization to pay a substantial fee to Arnowitz from the receivership estate of HML, supports a finding that Zimmerman should be replaced as Receiver. In his Motion to Replace the Receiver, Xarras alleged that Zimmerman paid Arnowitz $77,250.50 in fees from HML’s receivership estate between September 13, 2004 and November 2005. The record reflects that Arnowitz initiated the payment of his fees and expenses from HML’s receivership estate by filing a Motion for Payment of Administrative Fees and For Monthly Interim Payments on August 6, 2004, that was subsequently approved on August 13, 2004.
Having gained court approval to submit bills for fees, Arnowitz then emailed an invoice to Zimmerman for $20,250.50. Zimmerman then asked the court to approve payment of this $20,250.50 fee to Arnowitz in his First Interim Report, filed on September 28, 2004. Zimmerman’s request to pay Amowitz’s fee was subsequently approved by the court on October 19, 2004. Zimmerman’s accounts reflect a payment of $20,250.50 to Arnowitz on October 20, 2004. This is the only payment that was made to Arnowitz from HML’s receivership estate, and Zimmerman and Arnowitz made representations at the Hearing that there are no further requests for fees to be paid to Arnowitz from the receivership estate.
In the hearing on September 19, 2006 McCann, J. probed the issue of Zimmerman’s payment to Arnowitz from HML’s receivership estate;
The Court: Why did you as the Receiver pay a legal fee to Mr. Arnowitz?
Mr. Zimmerman: Because the court ordered me to do so Judge.
The Court: Why did you ask the court to authorize payment?
Mr. Zimmerman: I didn’t ask them, Mr. Arnowitz asked the Court to authorize payment.
The Court: Did you think it unusual that if he had an independent fee arrangement with Hilti that it might be inappropriate to pay an attorneys fee out of funds that are being held by a Receiver?
Mr. Zimmerman: Well, he received funds being held by the Receiver for work that he had done for the benefit of his client which was Hilti.
The Court: Well, then — but Hilti paid it, why the Receiver, that’s the question?
Mr. Zimmerman: Judge, I think Hilti was entitled to file a petition for the fee, he did the work, it was work in defending motions basically filed by Attorney Nickless on behalf of his clients.[68]
Zimmerman’s Failure to Scrutinize Arnowitz’s Fee Request
Zimmerman cannot simply state, as he did at the Hearing, that he was simply following a court order to pay Arnowitz. The method used by Zimmerman and Arnowitz was an end run on the court on essentially unopposed motions. As fiduciary to all parties, including HML, but more importantly the court, Zimmerman had a duly to preserve the estate from unnecessary waste, and to maximize the assets available to creditors. One of the ways this is done is by having the Receiver alone carry out all the work necessary to accomplish this goal, thus avoiding duplication of fees. That is why a Receiver is required to ask the court for permission before he hires anyone to assist him with his work, and why a Receiver has a duty to carefully scrutinize any fee requests that come before him. If the Receiver fails to fulfill this duty, it is incumbent on this court to ensure that the assets of the receivership estate are not wasted. The receiver in this case advocated on behalf of Arnowitz.
As such, Zimmerman had a duty to closely examine all requests for fees to be paid from the receivership estate, whether from Arnowitz or any other source. Thus Zimmerman had a duty to closely examine the propriety of Amowitz’s fee request at the time that Arnowitz made that request on August 6, 2004 when Arnowitz filed a Motion for Payment of Administrative Fees and For Monthly Interim Payments, or alternatively when Arnowitz sent Zimmerman an invoice. It is evident that Amowitz’s request for legal fees were requests for work that either should have been carried out by Zimmerman or if carried out for Hilti, should have been billed to Hilti and not the receivership estate.
There is little doubt that Arnowitz and Zimmerman have known each other for many years, have worked together on many other cases, and have cooperated with each other and worked closely together in this case. It appears that Zimmerman turned a blind eye to Arnowitz’s fee request, or at the veiy least, did not give it the scrutiny that he would have, if it had been made by an attorney for another creditor that he did not know.
This court has no doubt that Zimmerman’s relationship with Arnowitz contributed to this oversight. There is more than a whiff of suspicion that Zimmer *223 man was simply trying to share some of the wealth of the HML estate with Arnowitz when in fact Hilti should have paid approximately $13,162.50 of the bill. The remaining $7,072.50 charged for the April 2004 representation could have been paid out of the HML receivership estate if it had been approved by the court in advance, but this request was never made.
The Legitimacy of the Fee to Arnowitz
Arnowitz asserts that all the fees paid to him were legitimate because they were for work that was of principal benefit to the estate, and were therefore payable from HML rather than from Hilti.[69] Arnowitz cites a number of cases in support of this position. See Shannon v. Shepard Mfg. Co., 230 Mass. 224 (1918), In re American Tissue Mills, 120 F.Sup. 950 (D.C.Mass. 1954), Louisville, E. & St L.R. Co. v. Wilson, 138 U.S. 501 (1891), and Antoine v. James E. Nelson, 265 Mass. 214, 218 (1928).
In Shannon the SJC held that the Superior Court had the jurisdiction to allow attorneys fees in a receivership action when the fees were for actions that were carried out “for the common benefit of many persons.” Id. at 236. In Shannon an attorney had claimed fees for bringing the original motion which asked for a Receiver to be appointed in the case. Id. at 228. As such, the court determined that the fees for such a motion should be borne by the receivership estate rather than one of the creditors. Id. at 236.
Shannon is easily distinguishable from this case. In Shannon the attorneys fees were for an original petition to appoint a Receiver. In this case Arnowitz is asking to be compensated for actions taken years after the appointment of a Receiver. Inapposite to Shannon, where many other creditors benefited from the filing of the aforementioned motion, this case involves only two creditors of HML, Hilti and Suffolk, both of whom are represented by Arnowitz. Thus the reasoning behind allowing the fees to be paid for from the receivership estate is less readily apparent. This court declines to stretch the reasoning in Shannon any further than was stated in the Shannon case, but certainly not this case.
In In re American Tissue compensation was allowed for services in reorganizing an insolvent corporation to a petitioning creditor’s counsel who had spent approximately 63 hours preparing a petition for receivership, and who had numerous conferences after the petition was filed. The court ruled that the lawyer, who was counsel for the petitioning creditors, could be compensated for services that were of principal benefit of the estate. Id. at 952. Services were deemed to be of principal benefit to the trustee when they were performed before the appointment of the trustee, and where the attorney was counsel for the creditors’ committee. Id. Here, Arnowitz is attempting to be compensated for fees gained five years after Zimmerman’s appointment as Receiver, and where the only two creditors are both represented by Arnowitz. As such, In re American Tissue if anything, weakens Amowitz’s claim that his fees should have been paid out of the receivership estate.
An overriding principal in a receivership proceeding is that the receiver owes a fiduciary duty to all creditors as well as the court. Payment to Hilti and to Suffolk were not payments directly to those creditors. Payments were made to Arnowitz who represented both creditors. The fact that Arnowitz represented both creditors who have conflicting interests is problematic to begin with. But what compounds the problem more is that Arnowitz when questioned by this court about what the fee arrangement was between him and his two competing clients he refused to disclose that to the court claiming the attorney client privilege. This court assumes he also refused to disclose that information to Zimmerman, the receiver, for the very same reasons. Leave of court to pay Arnowitz directly was never sought nor obtained by Zimmerman. Zimmerman’s fiduciary duly ran directly to Hilti and to Suffolk, and not to Arnowitz. It also runs directly to the court. In the absence of such permission any person furnishing services to the receivership estate is a mere volunteer and cannot recover for such services. 31 Mass. Prac., Equitable Remedies §200 (2d ed.); Superior Court Rule 51 (1974).
The April 2004 Fee: Lack of Court Permission[70]
Both Mass.R.Civ.P. 66(d) and Superior Court Rule 51 limit the ability of a Receiver who is an attorney from employing an attorney without order of the court.[71] In the absence of such permission a person furnishing services to the receivership estate is a mere volunteer and cannot recover for such services. See Super.Ct. Rule 51 (1974); In re Whittemore, 157 Mass. 46, 47 (1892). The court may allow a creditor petitioning for the appointment of a Receiver reasonable costs, including fees. Shannon v. Shepard Mfg. Co., 230 Mass. 224, 236 (1918). Although Massachusetts has not ruled on the payment of other fees to attorneys for creditors, outside of the original petition for appointment of a Receiver, the Second Circuit addressed this issue in Davis v. Seneca Falls Mfg. Co., 17 F.2d 546 (2d. Cir. 1927). The court found that the allowance of fees to attorneys for unsecured creditors, whose labor benefited other creditors to be improper. Id. at 549.
At the Hearing Arnowitz stated that he was carrying out Zimmerman’s work in April 2004 while Zimmerman was on vacation.[72] As a preliminary matter it is difficult to see why Zimmerman or Arnowitz could not have simply requested a continuance from the court while Zimmerman was on vacation. Although not formally employed by Zimmerman, Arnowitz had effectively stepped into Zimmerman’s shoes as receiver. Before hiring any attorney, a Receiver is required to ask permission of the court to hire an attorney pursuant to M.R.C.P. 66(d). The reason behind that rule is to prevent the unnecessary duplication of fees and to avoid any conflicts of interest that might arise. These are precisely the issues which arose in this case between Arnowitz and Zimmerman.
Nothing suggests that Zimmerman ever petitioned the court to have Arnowitz take over his duties as *224 receiver in April 2004 when he was on vacation. Thus, Arnowitz was not authorized to carry out the work that he billed $7,072.50 during the week in April 2004 when he defended Moorshead’s motions. Even if this court accepts, as Arnowitz claims, that he was acting in the interests of his client, Hilti, it is difficult to see why Hilti would not pay the bill rather than the receivership estate. Thus the actions of Arnowitz and Zimmerman in the improper request to pay Arnowitz’s fee, when viewed in light of their close professional relationship, lend further support to the view that an attempt was being made to share the wealth of the HML receivership estate. No prior authorization of Arnowitz to act as attorney was applied for or approved by the court. He, therefore, acted as a volunteer and any fees paid to him should be returned to the receiver.
Conflicts of Interest: Arnowitz as Receiver
Although Xarras does not allege any conflicts of interest issues with regard to Arnowitz, it is apparent that these issues must be raised. Although Massachusetts has never addressed the issue of whether a Receiver hiring an attorney who also represents a creditor or conflicting creditor presents a conflict of interest, a review of Massachusetts conflicts law and other jurisdictions provides us with some guidance.
Other jurisdictions have stated that as a general rule a court should not authorize the employment by the Receiver of an attorney who has been representing any of the parties, or whose interest is opposed to that of a party to the receivership. See Cahall v. Lofland, 12 Del.Ch. 125, 107 A. 769, 769 (1919) (Receiver and his counsel should be impartial between stockholder(s) and creditors, and therefore an attorney of creditor should not act as attorney of Receiver); Liberty Folder Co. v. Anderson, 89 N.E.2d 500, 500 (1949) (equity does not sanction the employment by a Receiver of the attorney of any of the parties or one whose interest is opposed to those of the parties in the receivership action, nor of an attorney for the debtor); Bartelt v. Smith, 145 Wis. 31, 129 N.W. 782, 784 (1911) (while as a rule Receivers should not employ the counsel of either of the parties, where such counsel’s services to the Receiver do not conflict with his duties to the party, they may be employed and a reasonable counsel fee for their services may be allowed the Receiver); Hozz v. Varga, 166 Cal.App.2d 539, 543 (1959) (it is improper for the Receiver to employ as attorney, without an order of the court, the attorney for the plaintiff in the action in which the Receiver was appointed); Davis v. Bayless, 70 F.3d 367, 374 (5th Cir. 1995) (law of one state apparently disfavors, but does not prohibit, reliance by a Receiver on counsel for one of the parties to a receivership proceeding to cany out certain functions assigned by court order to the Receiver); Hyre v. Johnson, W.Va. 524 (1929). However, some courts have carved out an exception to the general rule, when there is “a perfect identify of interests between the plaintiffs and the Receivers or where the parties have consented.” Lowder v. All Star Mills, Inc., 309 N.C. 695, 702-03 (1983).
The disfavoring of using a party’s attorney to act as counsel for the Receiver is obvious. The duly of a creditor’s counsel is to zealously guard his interests at all times. One could easily envision a situation where the attorney might discover that his duties as Receiver required action that his client creditor would disapprove of. This court shares the view of the majority of jurisdictions that counsel for a creditor should not act as Receiver or be employed by the Receiver in any capacity because of the potential for conflicts of interest.
It is a general rule of application in the United States that an attorney may not simultaneously represent differing interests that are adverse to one another, unless both parties consent to the dual representation. Massachusetts follows this rule, on the ground that the undivided loyally that a lawyer owes to his client forbids him, without the client’s consent, from acting for the client in one action and at the same time against the client in another action, even if the lawsuits are unrelated in subject matter. McCourt Co., Inc. v. FPC Properties, Inc., 386 Mass. 145, 146 (1982). In McCourt the SJC based its decision on the Canons of Ethics and Disciplinary Rules Regulating the Practice of Law, [S.J.C. Rule 3:07], in particular on the provisions of DR 5- 105(B) which state that “[a] lawyer shall not continue multiple employment if it would be likely to involve him in representing differing interests.” Id. at 146.
Rule 1.7 of the Massachusetts Rules of Professional Conduct states that a lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless 1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client, and 2) each client consents after consultation. MRPC 1.7(a). In addition a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer’s responsibilities to another client, unless: 1) the lawyer reasonably believes the representation will not be adversely affected, and 2) the client consents after consultation. MRPC 1.7(b). When an attorney represents multiple clients in a single matter “the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.” MRPC 1.7(b)(2).
With respect to MRPC 1.7(b) loyally to a client is considered to be impaired when the lawyer “cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer’s other responsibilities or interests.” MRPC 1.7, Comment 4. Thus the crucial questions are: (1) the likelihood that a conflict would arise; (2) whether the conflict would materially limit the lawyer’s independent professional judgment. MRPC 1.7, Comment 4. Although due consideration should be given to whether the client “■wishes to accommodate the other interest involved.” Id. However a lawyer may not ask for a client to consent to *225 a conflict when “a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances.” MRPC 1.7, Comment 5. When a conflict exists before the representation of the client exists, the representation should be declined. MRPC 1.7, Comment 1. If the conflict arises after representation has begun, the lawyer should withdraw from the representation. MRPC 1.7, Comment 2.[73]
Amowitz could not be considered an independent counsel because he was acting on behalf of one of HML’s creditors. It is obvious that Amowitz’s duty to Hilti, as one of the creditors of HML, may have conflicted with his performance as Receiver because as counsel to Receiver it would be his duty to see that all creditors and parties are treated alike and with the utmost fairness. When asked by the court whether his simultaneous representation of both creditors, both Hilti and Suffolk, and the Receiver created a conflict of interest, Arnowitz stated that he was simply representing his client to protect its interest.[74]
There is no evidence before this Court that HML consented to this arrangement, and it would not matter if it had because a Receiver could not fulfill his role as a fiduciary to HML and the creditors if he represented both simultaneously. This court therefore concludes that Amowitz should not have been allowed to step into Zimmerman’s shoes and act as Receiver paid for the work in April 2004.
As previously stated, with regard to the April 2004 fees there is no evidence that Zimmerman ever petitioned the court for permission to employ Arnowitz to fill in for him when he was on vacation as he was required to do. By failing to give the court the opportunity to rule on the desirability of Amowitz acting as the Receiver, a conflicts problem was created. When viewed in context, it adds to the appearance that Zimmerman is more interested in spreading the wealth of the receivership estate, rather than acting in an economical and expedient manner. Thus, Arnowitz was nothing more than a volunteer and any fees paid to him should be returned to the receivership estate.
Arnowitz’s Conflict of Interest: Hilti and Suffolk
The court also notes Amowitz’s simultaneous representation of HML’s two unsecured creditors, Hilti and Suffolk, also presents a conflict of interest. Hilti and Suffolk were competing for limited funds in HML’s receivership estate, and thus their positions are mutually antagonistic, rather than mutually aligned. In this case, there is a clear conflict of interest. Although there is not a direct conflict of interest, because Arnowitz is not acting as an advocate against a client that he represents in another matter, his simultaneous representation of Hilti and Suffolk materially affects his ability to zealously represent these respective clients in violation of MRPC 1.7(b).
This conflict is not cured by consent, because a disinterested lawyer would conclude that neither Hilti nor Suffolk nor HML should agree to the representation under the circumstances. When asked about this apparent conflict at the Hearing, Amowitz stated that both of his clients had consented, although he offered no proof that this was the case. Assuming consent, the question then becomes whether “a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances.” MRPC 1.7, Comment 5.
As the attorney for a creditor it is Arnowitz’s duty to maximize the monetary return for his creditor against HML. It would not be difficult to imagine a scenario where the interests of one creditor are antagonistic to that of another creditor, and this is where Amowitz’s simultaneous representation of Suffolk and Hilti, the only two remaining creditors, becomes problematic in both theory and practice. Indeed, Arnowitz’s conflict of interest is perfectly illustrated by his supposedly pro rata distribution of payments to creditors Hilti and Suffolk. (See G.L.c. 156(b), §106, a Receiver is required to “distribute the funds ratably among the court approved creditors.”) Amowitz is a lawyer representing conflicting creditors, and not a creditor. The creditors are Hilti and Suffolk. Amowitz stated at the Hearing that the payments from HML’s estate were split pro rata, 95% to Suffolk and 5% to Hilti. Other than that representation, no other proof was presented to this Court. However the actual pro rata split of creditor payments between Suffolk and Hilti should have been 86% and 16% respectively.[75] If Hilti had had independent counsel there can be little doubt that they would have challenged Amowitz’s low distribution payment. With Amowitz representing both Hilti and Suffolk there was nobody to fulfill and oversee the important function of protecting Hilti’s rights. This perfectly illustrates why a disinterested lawyer would not recommend that a judgment creditor should be represented by an attorney who is also representing other judgment creditors of the same debtor corporation.
Zimmerman’s Affidavit Against HML
In his Motion to Replace the Receiver, Xarras alleges that on June 21, 2005 Zimmerman signed and filed an affidavit advocating that the court assess treble damages against HML in the Suffolk case.[76] Xarras states that this is clearly against the interests of HML and constitutes a blatant breach of Zimmerman’s fiduciary duty to HML. Zimmerman alleges in the affidavit that Xarras was negotiating on behalf of HML with the IRS without his authority. Subsequently, on December 21,1999 the IRS, pursuant to a settlement agreement, adjusted HML’s tax retum(s) by adding $985,920.43 to its taxable income. Zimmerman stated that in settling the action with the IRS Xarras admitted that he had diverted $833,875 from HML in 1995 to the detriment of creditors.[77]
It is perhaps noteworthy that Zimmerman states that he was “charged with the duty of collecting all HML Development Corp.’s assets for the benefit of its creditors,”[78] and that he “owe[d] a duty” to the creditors of HML.[79] However it is clear that Zimmerman *226 also owes a fiduciary duty to this court and HML, not just the creditors. This action adds weight to a finding that the Receiver should be removed as he is not acting in an impartial manner.
Xarras’s Dilatory Motion to Remove the Receiver
Under Mass.RCiv.P. 5(b), service may be made by mailing the paper to the party or attorney at his last known address; if no address is known, the paper may be left with the clerk of court. Notice is complete upon depositing the correctly addressed, postage prepaid notice in the mailbox. See Checkoway v. Cashman Bros. Co., 305 Mass. 470, 471 (1940). Rule 5(d) has been expanded to eliminate all formalities as to proof of service of papers upon other parties. If an adverse party challenges the adequacy of notice, the serving party will of course have to prove service. In order to minimize frivolous challenges, Rule 5(d) provides that a simple statement signed under the penalties of peijuxy will suffice to establish prima facie proof of service. The statement is designed to make explicit that the attorney’s failure to supply proper proof of service does not invalidate the service if in fact it has been properly completed.
Xarras’s Motion to Replace the Receiver must be viewed in light of the fact that Xarras waited seven years to contest any of the Receiver’s actions. Zimmerman was appointed Receiver on March 19, 1999. Xarras did not file any oppositions to Zimmerman’s Interim Expense Reports or Requests for Fees, and has not filed a Motion to Remove the Receiver until April 2006. Dombrowski filed a Motion to Intervene in the current action on April 20, 2006, which Hilti objected to because Dombrowski was allegedly already in the case and had been sent notices to everything filed in the case.[80] In the hearing Dombrowski stated that he had never seen a Motion to Reach and Apply Xarras and that he had first got into this case after Zimmerman filed a Complaint for Contempt against Xarras.[81] Dombrowski further stated that he was unaware that Xarras was an actual defendant in this case.
Notice to Dombrowski
The docket indicates Dombrowski as Xarras’s attorney of record in this action since January 13, 2000. Indeed the first pleading bearing Dombrowski’s signature in this case is the Assent of Parties Removal of Default, filed January 13,2000. Each Interim Report and Request for Payment of Fees and Expenses has an attached signed affidavit of compliance from Zimmerman pursuant to Superior Court Rule 9A(b)(2), in which he swears that service was made on Dombrowski at Dombrowski & Aveni, LLP, 6 Grove Avenue, Leominster, MA 01453. Each affidavit also states that “no response has been received from... Attorney Dombrowski, within three business days after the expiration of the time permitted for service of the response to the . . . Interim Report.” In addition the docket reflects that notices were mailed to the attorneys of record after the court approved each report.
Zimmerman and Arnowitz have satisfied the notice requirements of Rule 5(d) of the Massachusetts Rules of Civil Procedure. Dombrowski has been the attorney of record since January 13, 2000 and cannot claim that he did not have notice of Zimmerman’s activities. However, the delayed nature of HML’s Motion to Remove the Receiver is heavily outweighed by the merit of the motion to Replace the Receiver.
CONCLUSION
The actions of Zimmerman and Arnowitz cannot be viewed in isolation, but must be viewed together, and in view of their undoubted close professional relationship. This court has no doubt, that Zimmerman’s and Amowitz’s close professional relationship colored decisions that they have made with regard to the receivership estate. Zimmerman’s failure to promptly foreclose on the Fitchburg and Westminster Properties is ample evidence that Zimmerman was more interested in extending the length of the receivership as a vehicle for generating fees for himself and his associates, rather than as a prompt and efficient mechanism for liquidating all of HML’s assets and making rapid payments to creditors and then shareholders as the statute requires.
Specifically this court finds that since his appointment as Receiver in this case in March 1999 Zimmerman has: (1) failed to properly carry out his statutory duty to expeditiously liquidate the assets of HML and make prompt payments to creditors; (2) failed to adequately scrutinize Arnowitz’s highly questionable 2004 request for payment of fees and expenses from the HML estate; (3) failed to ask the court for permission to hire attorneys to assist him in the receivership, and then billing the receivership estate for their time; (4) failed to ask court permission to have Arnowitz act as Receiver when he was on vacation in April 2004; (5) breached his duty to HML by submitting an affidavit for Arnowitz advocating the imposition of treble damages against HML in the Suffolk case; (6) acted improperly by employing the Boston-based husband of an associate in his firm to act as property manager of the Fitchburg property, and then paying his fees from the receivership estate; (7) failed to provide the court with a detailed inventory of possessed property, or property as to which the Receiver has a right to possession within 30 days of his appointment, and failed to seek an extension of time from the court if required; arid (8) failed to file any annual detailed report of the condition of the receivership by February 19 of each year pursuant to Mass.R.Civ.P. 66(c); (9) failed to comply with orders of Murphy, J. and McCann, J. to deposit funds in an interest-bearing account.
As such, it is apparent to this court that it would be in the interest of all parties to replace Zimmerman as Receiver for HML. Zimmerman should be replaced with a Receiver that is entirely independent and unaffected by any relationship to the creditors in this case. In that way the court can ensure, as it is bound to do, that the Receiver is in the best possible position to *227 properly fulfill the fiduciary duty that he owes to HML, HML’s creditors and to this court.
ORDER
It is therefore ORDERED that the Motion to Replace the Receiver is ALLOWED and it is ORDERED as follows:
HML’s Motion to Replace the Receiver is Allowed.
Zimmerman’s Motion for Reconsideration of the Escrow of his Fees is Denied.
Amowitz’s Motion for Reconsideration of the Escrow of his Fees is Denied and his Cross Motion for Costs is Denied.
Amowitz’s Emergency Motion for Reconsideration Seeking a Stay of the Court’s Sua Sponte Order Dated May 15, 2006 and the Court’s Denial of Amowitz’s Motion for Reconsideration is denied.
The Court VACATES the Order of Peter L. Zimmerman as Receiver and Discharges him.
The Court appoints Roy A. Bourgeois as Receiver and he shall post the statutory bond as a condition of his appointment. All assets presently held by the Discharge Receiver Peter L. Zimmerman shall be transferred forthwith to Roy A. Bourgeois.
The Court takes no action at present on the Fifth Interim Account.
In addition to his normal duties as receiver, Roy A. Bourgeois is directed to review the entire receivership proceeding in light of this report and to make such recommendations to this Court as he sees fit.

HML ceased to accept business in mid-1996, and filed its final tax returns in 1996, although the corporation was never formally dissolved.

On November 9,2006, both Zimmerman’s and Arnowitz’s Motions to Reconsider were denied, McCann, J., and it was ordered that “deposits shall be made forthwith and that notice of the deposits shall be filed with the Court indicating the name, location and account number of the account.” (McC-ann, J.)

Receivers are now appointed from a court-approved list. However, at the time of the appointment of the Receiver in this case a court-appointed list did not exist, and counsel for the plaintiff could suggest the name of a Receiver for approval by the court. Arnowitz requested that Zimmerman be appointed as Receiver in this case.

Under the statutory receivership protocol if a judgment has been recovered against a corporation and it has neglected for thirty days after demand made on execution to pay the amount due with the officer’s fees, or to exhibit to the officer real or personal property belonging to it and subject to be taken on execution sufficient to satisfy the same and the execution has been returned unsatisfied, one or more Receivers may be appointed with the powers and duties provided in, and subject to section one hundred and four. See G.L.c. 156(b), §105.

Amowitz had been retained by another creditor of HML, Suffolk Construction (“Suffolk”), in April 1998. His relationship with Suffolk will be elaborated on hereinafter.

The docket entry incorrectly indicates that an Answer was received from “HML Development Corp (Defendant)” on May 21, 1998. The failure of HML, a corporation, to hire an attorney to represent it, and file an answer on behalf of the corporation defendant and HML will be elaborated on hereinafter.

Silverman and Kudisch, P.C., 1320 Centre Street, Suite 203, Newton Center, MA 02459.

A Massachusetts trust, under Declaration of Trust, a Massachusetts Trust, dated March 9, 1992, Louise M. Shea, Trustee.

Dated January 17, 1991.

The Pappas brothers, of Fitchburg, Massachusetts, are cousins of Xarras.

Dombrowski’s Entry of Appearance is noted as January 13, 2000 on the docket, and this appears to be the first time that he appears for Xarras individually and HML in this case.

In this hearing on March 24, 2000 Fecteau, J. also allowed Zimmerman’s Motion to Receive Mortgage Payments and For Assignment of Said Mortgages as previously described.

Suffolk Superior Court, Civil Action No. SUCV1993-04412.

Suffolk Superior Court, Civil Action No. SUCV98-01235.

This motion was granted on September 14, 2000.

The “Quincy Property”.

Memorandum of Decision, Pages 2-3.

Id. at 11.

Id.

Assuming 12% statutory interest on the $160,493.83 owed by HML as of September 14, 1999, HML would have owed the following to Suffolk: 9/1999: $160,493.83; 9/2000: $179,753.08; 9/2001: $201,323.46; 9/2002: $225,482.27; 9/2003: $252,540.14; 9/2004: $282,844.96; 9/2005: $316,786.36; 9/2006: $354,800.72.

Memorandum of Decision, Page 11.

Moorshead is Xarras’s sister.

The attached checks were valued at $13,860.75

Notice of Filing was sent to all parties on August 5, 2004.

The judgment of the Suffolk Superior Court found that the amount owed by Suffolk on September 14, 1999 was $160,212.17, which is $860,372.15 less than the amount that Arnowitz originally stated that was owed to this court.

This amount was claimed even after allowing for the credit of certain escrowed funds in the amount of $44,212.17 and the application of the net proceeds of a mortgage owned by HML on real estate in Quincy.

See Plaintiffs Motion for Payment of Administrative Fees and Monthly Interim Payments, August 6, 2004, Page 3, Paragraph 11.

In her previous motions filed on April 2,2004 Moorshead had claimed to be Trustee of the Charles Park Realty Trust, but did not claim to be the sole beneficiary.

See Memorandum of Law in Support of Moorshead’s Opposition to Plaintiffs Motion for Payment Motion for Payment of Administrative fees and For Monthly Interim Payments, Page 2.

 In rejecting the motions McDonald, J. stated in a margin entry that, “this is nothing more than a motion to reconsider with nearly identical affidavit and memorandum, i.e. nothing new of substance.”

Gross rents were then $14,660.75, resulting in a monthly management fee of $1,246.86. Zimmerman states that this is below the industry standard of 10%.

It should be noted that the time log attached to the report actually includes Zimmerman’s time until August 31, 2004. It is assumed that the reference to 2001 on page 3, paragraph 3 is a typo.

$40,848.50 in fees plus $614.24 in expenses.

See Arnowitz’s Motion for Payment of Administrative Fees and For Monthly Interim Payments, allowed on August 12, 2004 (Kem, J.).

Amowitz’s firm billed 54.1 hours at $275.00 per hour and 21.5 hours at $250.00.

See Memorandum of Facts and Law in Support of Petitioning Creditor’s Counsel Fees in Support of Receiver’s Request for Instructions.

See Receiver’s Application for Instructions, September 28, 2004, Page 2, Paragraph 6.

Hause is an associate attorney at Amowitz’s firm.

There is no suggestion as to why Arnowitz could not have appeared and asked for a continuance to allow Zimmerman to go on vacation and return, or even that Zimmerman could not have done so. What are referred to by Arnowitz as “emergency motions,” this court determines they are not emergency motions.

Moorshead’s Motion to Intervene and Revoke Court’s Order Granting Receiver’s Motion to Receive Mortgage Payments, or, in the Alternative, to Stay Implementation or Order, and for Turn Over of All Rents Received, August 23, 2004.

Hilti was the original creditor who in 1997 was owed $26,139.99 as a judgment creditor, and filed this Petition for a Statutory Receivership.

Payment was made as noted above to “Arnowitz & Goldberg/Hilti, Inc./Suffolk” and not directly to the creditors.

It is not clear why it was necessary for both Arnowitz and Zimmerman to both be filing oppositions.

The Motion to Intervene was allowed by Murphy, J. on May 15, 2006, is not before the court and was not addressed in this memorandum.

Again, it is not clear why both Arnowitz and Zimmerman needed to file opposition and therefore incur fees for both.

Transcript of Hearing, page 76, Lines 23-24.

It is not clear why Xarras’s counsel would have needed to file a Motion to Intervene as he had been the counsel of record since January 13, 2000, and had been receiving notice of all motions and orders in this case.

Zimmerman contends that Judge Murphy actually denied Xarras’s Motion to Replace the Receiver and took no action on Amowitz’s cross motion for costs. See Transcript, Page 23, Lines 21-23. The record does not reflect that to be the case.

Nickels represented Alexis Curry as Trustee of the Charles Park Realty Trust.

This motion was allowed (McCann, J.), and is not discussed in this memorandum.

 In this case Hilti was a judgment debtor. Suffolk was an unliquidated contract creditor which was in ongoing litigation with BML.

See Order Appointing Receiver, Paragraph 4, March 19, 1999 (Toomey, J.).

See Receiver’s Petition for Authorization to Receive Mortgage Payments Due Defendant and For Assignment of Said Mortgages, November 9, 1999.

Hearing transcript, page 17, lines 8-9.

Hearing transcript, page 18, lines 4-8.

Hearing transcript, page 69, line 17.

See Xarras’s Motion to Remove Receiver, Page 2, Paragraph 6(a).

See Receiver’s Response to Order Entered on November 9, 2006 and Receiver’s Request for Clarification Thereof, November 28, 2006.

See Motion to Remove Receiver, Page 2, Paragraph 7.

Id. at page 2, Paragraph 5.

Hearing Transcript, page 53, lines 7-9.

Id. at page 53, line 10.

Id. at page 56, lines 20-23.

Id. pages 56-57, lines 23-24, line 1.

Id. at page 57, lines 1-3.

Id. at page 68, line 9.

Id. at page 68, lines 6-9.

Hearing transcript, Pages 83-83, Lines 19-17.

Amowitz does not cite any legal authority for the payment of his fees from the receivership estate in his Motion to Reconsider. However Arnowitz did cite authority for the payment of his fees in a memorandum attached to Zimmerman’s First Interim Report and Request for Payment of Expenses, and it is these authorities that are now addressed.

Although Arnowitz denied that he was paid a fee at the hearing, it would appear to be a fee by any modem understanding of the word.

M.R.C.P. 66(d) and Sup.Ct. Rule 51 are identical and state that,
When an attorney at law has been appointed a Receiver, no attorney shall be employed by the Receiver or Receivers except upon order of court, which shall be made only upon the petition of a Receiver, stating the name of the attorney whom he desires to employ and showing the necessity of such employment.
(Emphasis added.)

Amowitz: I filed an application with the court for the court to approve payment of a fee of twenty thousand dollars for the work that I did for the Receiver because Mr. Nickless wouldn’t allow him to continue the case. Hearing Transcript, Page 81, 21-24.

It should be noted that the “appearance of impropriety standard” is not relevant to this analysis. Comment five (5) under Rule 1.9, dealing with the conflicts resulting from former clients states,
The other rubric formerly used for dealing with disqualification is the appearance of impropriety proscribed in Canon 9 of the ABA Model Code of Professional Responsibility. This rubric has a twofold problem. First, the appearance of impropriety can be taken to include any new client-lawyer relationship that might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client. Second, since “impropriety” is undefined, the term “appearance of impropriety” is question begging. It therefore has to be recognized that the problem of disqualification cannot be properly resolved either by simple analogy to a lawyer practicing alone or by the very general concept of appearance of impropriety.

Hearlng transcript, Page 82, lines 7-14.

With HMLowing$160,493.83 to Suffolk as of September 1999, and $26,139.99 to Hilti as of November 1997.

Receiver’s Affidavit in Support of the Plaintiffs Request for Separate Judgment and Treble Damages Against HML Development Corp. Attached as Exhibit “A” to Xarras’s Motion to Replace Receiver.

As noted these allegations against HML in the Suffolk case were found to be without merit.

Affidavit, Page 2, Paragraph 3.

Affidavit, Page 3, Paragraph 7.

Hearing transcript, page 19, lines 1-3.

The Complaint for Contempt was filed in November 1999.